O. D. LAUCK, D.B.A. MERIDIAN MEMORIAL PARK CEMETERY
*v.* GILBERT

No. 43226 April 12, 1965 173 So. 2d 626

*Lester E. Wills,* Meridian, for appellant.

*Holyfield & Goldman,* Meridian, for appellee and cross-appellant.

Kyle, P. J.

This case is before us on appeal by O. D. Lauck d/b/a/ the Meridian Memorial Park Cemetery, defendant in the court below, from a decree of the Chancery Court of Lauderdale County rendered in favor of Joe Gilbert, complainant, awarding damages to the complainant in the amount of $1500 for the wrongful ob-

struction of the natural flow of water through a large drainage ditch running through the western side of the Meridian Memorial Park Cemetery land and thereby causing water to back up on the land of the complainant lying immediately north of the defendant's land and to fill up with sand the ditches running through the complainant's land, and providing for the issuance of a mandatory injunction enjoining the defendant from maintaining the ditches on his property in such manner as to damage the property of the complainant, and ordering the defendant to perform such work as may be necessary to eliminate its obstruction to the natural flow of water complained of through the ditches or his property which drained the complainant's land.

The original bill of complainant was filed by Joe Gilbert on December 13, 1960. The defendants named in the original bill were O. D. Lauck d/b/a the Meridian Memorial Park Cemetery, and Dr. E. B. Robinson, Woodrow Edsel Cook and W. Walton Moore, Jr., trustees of the Meridian Memorial Park Cemetery Trust Fund.

The complainant alleged in his bill that the defendant O. D. Lauck was the owner in fee simple of a parcel of land, specifically described by metes and bounds as a fractional part of the SW¼ of the NW¼ of Section 21, Township 6, Range 15, in Lauderdale County, containing 20 acres more or less; and that the defendant O. D. Lauck was engaged in the business of operating and maintaining ''a memorial park cemetery wherein the right of sepulcher is sold under contract and agreement for perpetual care and maintenance of said cemetery.'' The complainant further alleged that the defendants E. R. Robinson, Woodrow Edsel Cook and W. Walton Moore, Jr., were the trustees of ''The Meridian Memorial Park Trust Fund'', pursuant to the terms of House Bill No. 170, Ch. 481, Gen. Laws of Mississippi 1958, known as the ''Cemetery Act,'' and

that said trustees were responsible for the care and maintenance of the cemetery located on the above described parcel of land, which care and maintenance included the proper care and maintenance of any ditches running through the cemetery property.

Complainant further alleged that the complainant was the owner of the NE¼ of the NE¼ of Section 20, and fractional parts of the NW¼ of the NW¼ of Section 21, all in Township 6, Range 15, in Lauderdale County, specifically described in the bill of complaint, lying immediately north of and adjoining the above described parcel of land owned by the defendant Lauck; that the defendant trustees held in their hands certain sums of money which they were required to use for the perpetual care and maintenance of the cemetery located on the above described property owned by the defendant Lauck.

The complainant further alleged that a large natural drainage ditch ran in a northerly and southerly direction and to the west side of the cemetery property; that the ditch originated on land north of the land owned by the complainant and had drained the land owned by the complainant for a period exceeding ten years prior to 1957; and that the complainant had the right to have the water draining from his property drained through the above mentioned ditch; that during the early part of 1957 the defendant Lauck attempted to purchase certain acreage owned by the complainant which adjoined the cemetery property, and the complainant refused to sell the land to him; and that following the complainant's refusal to sell the land to him the defendant began to fill up the above mentioned drainage ditch with logs, trash and other materials and had continued to fill up the ditch until the date of the filing of complainant's bill. Complainant further alleged that he had demanded that the defendant Lauck clean out the drainage ditch and maintain the same so that the water would

continue its natural flow through the ditch unimpeded, but the defendant Lauck had failed and refused to take any action to clean out the ditch and maintain the same as a natural drainage ditch. The complainant further alleged that the defendant trustees had permitted the defendant Lauck to take the above mentioned action and had refused to take any action themselves to clean out and maintain the ditch, and had in fact disclaimed any responsibility for maintaining the ditch which ran through Memorial Park Cemetery.

The complainant further alleged that, as a result of the wrongful actions of the defendant Lauck in obstructing the flow of water through the above mentioned drainage ditch, the water which would have flowed naturally through said ditch had been caused to back up on the complainant's land, and that portion of the ditch which ran through the complainant's land had been caused to fill up with sand and dirt, and water which ordinarily would have been carried off by the above mentioned ditch had been caused to pond upon and remain upon complainant's land for days at a time, and to deposit sand upon the complainant's land. The complainant further alleged that, as a result of the wrongful actions of the defendant Lauck in obstructing the flow of water through the above mentioned drainage ditch, clover seed which complainant had planted on several occasions and fertilizer which he had placed upon said land had been washed away; that prior to the wrongful acts complained of the complainant's land was covered with rich soil especially adapted to farming purposes, but the land at the time of the filing of the complainant's bill was covered with sand. The complainant alleged that the defendant should be required to clean out and properly maintain the ditch running through his property, and the complainant should be awarded damages in the amount of $1500 to cover the cost to the complainant of cleaning out and restoring

ditches on complainant's own property, which had been caused to fill up by the defendant Lauck's wrongful acts.

The complainant further alleged that the obstruction of the flow of water through the above mentioned ditch, as stated above, constituted a nuisance insofar as the complainant was concerned; that, if the complainant should clean out the ditches on his own property, they would fill up again with sand and dirt so long as the defendant was allowed to maintain such nuisance; that the damages complained of were tangible and substantial; and that the defendant should be enjoined from operating and maintaining such nuisance.

Complainant further alleged that the main ditch which ran through the western portion of the cemetery property was fed by a number of feeder ditches, one of which also ran through the defendant's property, and that the defendant Lauck had caused a levee or dam to be built across the ditch and had thereby caused the water which was accustomed to flow through the cemetery land to be diverted across the land owned by the complainant; and that as a result of the wrongful construction of said levee a portion of the complainant's land had been damaged by water running across it and standing on it, and in consequence thereof many trees had been lost during the flooding of the complainant's land.

The complainant prayed that on the final hearing of the cause the complainant be awarded a judgment against the defendant Lauck in the sum of $9,944.15, and that a mandatory injunction be issued requiring the defendant to abate the above mentioned nuisance and enjoining the defendants and each of them from maintaining said nuisance, and requiring the defendants to maintain the above mentioned ditch running through the cemetery property in accordance with the prescribed methods ordinarily followed in such matters.

On December 28, 1960, the defendants E. R. Robinson, W. Edsel Cook and W. Walton Moore, Jr., filed a

general demurrer to the complainant's bill in which they alleged that there was no equity on the face of the bill, and that the facts alleged by the complainant in his bill did not state a cause of action against the trustees. The defendant trustees also filed an answer in which they denied that they were responsible for the care and maintenance of the cemetery, including the proper care and maintenance of ditches running through the property, and in which the trustees denied that they had any duty relative to the care and maintenance of the cemetery or the ditches on the property. The defendants also averred in their answer that they had no knowledge of the allegations of the complainant's bill relating to the drainage ditch running in a northerly and southerly direction to the west side of the cemetery property, or the actions alleged to have been taken by the defendant Lauck which resulted in the obstruction of the flow of water through said ditch. On January 16, 1961, the court entered an order sustaining the general demurrer filed by the defendant trustees and dismissing the complainant's bill as against the defendant trustees.

On February 14, 1961, the defendant O. D. Lauck filed a general demurrer to the bill exhibited against him alleging as grounds therefor the following: (1) That there was no equity on the face of the bill; (2) that the bill did not aver facts upon which it might be inferred that the complainant had acquired the right by prescription to concentrate the flow of water from his lands to' the lands owned by the defendant; (3) that the bill did not aver any facts tending to show that the defendant was under any duty to the complainant to maintain the ditches referred to in the bill; (4) that the bill did not allege any negligence or willful or malicious acts perpetrated by the defendant which were the proximate cause of the damages claimed therein; and (5) that the bill did not aver that the complainant had offered to

do equity. On July 28, 1961, an order was entered over-ruling the defendant Lauck's general demurrer to the bill of complaint, and granting the defendant thirty days additional time within which to file his answer.

In his answer the defendant Lauck admitted that he, as the owner, and his successors in title and interest were responsible for the maintenance and care of the cemetery located on the land described in the complainant's bill, and that the sole responsibility of the trustees was to receive, hold and invest "the perpetual care endowment fund" and to collect and pay over to the defendant all income from the investment of said funds for the use of the defendant in maintaining the Meridian Memorial Park Cemetery in perpetuity.

The defendant admitted that the complainant owned the land lying immediately north of and adjacent to the cemetery property, but denied that there was a large natural drainage ditch running in a northerly and southerly direction at any place on the cemetery property. The defendant averred in his answer that there was a large artificial ditch which had been constructed and was being maintained along the hollow or swale on the west side of the defendant's property, which ditch extended from a point approximately 200 feet south of the boundary line between the cemetery property and the complainant's land to the old Highway No. 80 on the south edge of the cemetery property; and that a smaller ditch had been constructed from the north end of the large ditch to the northern boundary of the cemetery property. The defendant averred that the ditch, running southwardly through the complainant's land and draining into the small ditch on the defendant's land was not a natural drainage ditch, but was either an artificial ditch or was caused by erosion or an increased flow of water from the complainant's land to the defendant's land at or near the north end of complainant's ditch. The defendant denied that the small

ditch extending from the north line of the defendant's property to the north end of the large ditch mentioned above had drained the water from the complainant's land for a period of more than ten years; and the defendant denied that the complainant had the right to have the water drained from his land through the ditch or ditches on the defendant's land.

The defendant admitted that in the year 1957 he inquired of the complainant if he desired to sell his land adjoining the cemetery property on the north, but the defendant denied that he had made any offer to purchase the complainant's land. The defendant denied that he had ever begun to fill up any drainage ditches upon his property with logs, trash or other materials. The defendant, however, admitted that at various times he had caused logs, poles, stakes and other protective materials to be placed in the areas of the small ditch where the same was caving in and widening its banks due to the increase in flow of waters from the complainant's lands. The defendant denied that any action of his had caused the ditches on complainant's land to fill up with sand or dirt or had caused water to pond upon or remain upon complainant's land. The defendant denied that the complainant had suffered any irreparable injury as a result of any wrongful act of the defendant.

Finally, the defendant averred in his answer that the point at which the ditch running southwardly through the complainant's land crossed over the boundary line between the complainant's land and the defendant's land was only a short distance from the west boundary of the cemetery property, and since the complainant owned the land to the north and west of the defendant's land a ditch running westwardly from that point to the northwest corner of the defendant's property, or to a point on the complainant's land immediately north thereof, could easily be constructed to carry away all the

water which was accustomed to flow southwardly into the above ditch running through the defendant's land, and the defendant offered to do equity by assisting complainant in the construction of such a ditch.

The case was called for trial on its merits at the February 1962 term of the court; but after the hearing had begun and before the complainant had completed his testimony, the complainant found that it was necessary that he request permission to amend his original bill. The court sustained the complainant's motion for leave to file such amendment, and the case was remanded to the docket for further hearing at a later date after the filing of the complainant's amendment. The amendment was filed on April 10, 1962.

In his amendment the complainant first amended the paragraph of the original bill describing the cemetery property so as to include two parcels of land which had been omitted from the description contained in the original bill. The complainant then charged that the defendant Lauck or his predecessors in title, within the last ten years, had caused to be constructed a bridge across the drainage ditch running southwardly through his land, which bridge acted as a water check and interferred with the proper flow of water through the drainage ditch. The complainant therefore asked that the court order the bridge removed, or direct the defendant to place under the bridge a drainage pipe or culvert of sufficient size to allow the water to flow freely through the ditch as it had always done in previous years. In the amendment the complainant further charged that the defendant Lauck had caused to be constructed immediately east of the dam referred to in the original bill a drainage ditch whereby the water was caused to be diverted from the defendant's six-acre tract onto the complainant's property. And, finally, in his amendment the complainant alleged that he had suffered additional damages not claimed in the original bill as a

result of the defendant's wrongful actions, in that he had been required to purchase additional feed for his cattle, rent additional pasture land, haul cattle from the home place to the rented pasture, open ditches on lands damaged by the actions of the defendant; and the complainant also charged that he had lost additional fertilizer, seed and labor since the filing of the original bill and up to January 1, 1962; all in the amount of $5,025.95 over and above the damages claimed in the original bill.

On May 9, 1962, the defendant filed a demurrer to the complainant's amendment and also a motion to strike the amendment, and an answer to the amended complaint.

The trial was resumed at the May 1963 term of the court. The testimony consists of approximately 900 pages. No useful purpose would be served by our undertaking to summarize the testimony of each of the witnesses. However, we shall summarize briefly parts of the testimony of Gilbert and Lauck.

The complainant Gilbert testified that his land was in a drainage basin which had its origin above Lost Gap Road, a county road running in an easterly and westerly direction a short distance north of the north boundary line of Section 21; that the water falling on approximately 1000 or 1500 acres of land drained into the drainage ditch referred to in the pleadings which was a natural drainage ditch in which he used to play when he was out there chopping cotton. "That was about 25 years ago." The ditch ran southwardly from the northern boundary line of Section 21 and crossed over into the cemetery land at a point about 30 feet east of Lauck's northwest corner. The ditch then continued southwardly at an angle, and got wider as it passed through the cemetery property and finally emptied its waters into Fairchild's Creek some distance south or southwest of the cemetery property.

Gilbert identified a roughly drawn sketch or plat of his land and the defendant's land which showed the relative location of the lands owned by each of the parties and the location of the above mentioned drainage ditch running southwardly through his land and the cemetery land. The plat was admitted in evidence as an aid to a proper understanding of the witness' testimony. The plat showed as Ditch "A" that part of the drainage ditch as it passed through the complainant's land, and as Ditch "E" that part of the drainage ditch as it continued southwardly through the cemetery property. The plat also showed other tributary ditches, including a ditch marked Ditch "B" running southwestwardly through Gilbert's land and intersecting Ditch "A" at a point a short distance north of the boundary line between Gilbert's land and the cemetery property. Gilbert stated that the large ditch referred to in the pleadings, which was designated as Ditch "A" on Gilbert's land and Ditch "E" on the defendant's land passed under old Highway No. 80 and the Illinois Central Railroad track at points only a few feet south of the south boundary line of the cemetery property. Gilbert stated that the ditch marked "E" had always been 6 or 8 feet deep, and in some places 10 or 12 feet deep. Gilbert stated that the culvert which carried the waters of the ditch under the railroad track south of Old Highway No. 80 was a five-foot culvert, and he knew of his own personal knowledge that it had been there about 20 years.

Gilbert stated that there was no flooding of his land and he had no drainage problem during the time the cemetery land was owned by Mr. L. L. Christy, Lauck's predecessor, and he had no trouble with Mr. Lauck until the fall of 1956 or the first part of 1957, when Mr. Lauck talked to him about buying the parcel of land which he owned just immediately north of the cemetery property. He told Mr. Lauck that he did not desire to sell any part of the small tract of land, but if a man had

the money to buy the whole tract he would consider selling it. Mr. Lauck was not interested in purchasing the whole tract. Gilbert stated that soon thereafter Mr. Lauck had Mr. E. E. Freeman of the ASC office inspect the land and see about getting Mr. Gilbert to cut a ditch all the way across the south side of the Gilbert tract, which would be about one-half mile, and turn the water into Fairchild's creek. If that were done Mr. Lauck could then fill up the ditch marked "E" which ran through the west side of the cemetery property. Gilbert stated that several weeks after the ditch started filling up he got Mr. Freeman to come out there, and Mr. Freeman advised him that it was not feasible for him to have a ditch cut across his land running westwardly to the creek along the route suggested by Mr. Lauck; that it would take approximately 30 feet for a right of way through there to drain all the water into the creek and at some points the ditch would be 15 or 20 feet deep. Gilbert stated that the ditch marked Exhibit "C", which ran southwestwardly through his land, had been located along the line shown on the diagram for a period of about 17 years. Gilbert stated that his land in that area had been tillable up until a few years back; but he had converted the row crop land into pasture land about the time Mr. Lauck purchased the cemetery property, and all of his land in the area involved in this controversy had been planted and seeded for improved pasturage in accordance with the recommendations of the ASC service officers. He had planted Crimson Clover and improved S-1 Louisiana White Clover. He had Bahia grass and Dallas grass; but at the time of the trial none of these grasses were growing on the flooded area. The remaining part of Gilbert's testimony followed closely the allegations of his bill of complaint.

The defendant Lauck, who was called to testify as an adverse witness by the complainant, testified that he

acquired the cemetery property lying south of the Gilbert land on November 20, 1956; that he was familiar with the ditch which ran through the west side of the property in a general southerly direction; that the ditch at the time he acquired the cemetery property was more or less like a small creek running through there like any other ditch on a similar parcel of land; that the ditch was approximately 10 or 15 feet deep in some places, but up next to the bridge referred to in the pleadings the ditch was about 12 or 13 feet deep, and there were several places where holes were washing in the ditch and the banks were eroding; that the ditch became deeper as it ran southwardly through the property. Lauck stated that the ditch had a bridge across it when he bought the property. The width of the driveway across the ditch or culvert was about 18 feet. The culvert under the bridge was a 42-inch corrogated culvert about 18 feet long. There was a concrete retaining wall on each end of the culvert.

Lauck stated that he had done some work in the general area to take the surface water from the driveways in the cemetery. He had put in sewer pipes with drains to catch the water that was falling on the driveways and take it down by the side of a retaining wall into the ditch. The water formerly went into the ditch, but it was creating a washout and Lauck put tile in there to eliminate the erosion. Lauck stated that where the banks were eroding and big holes were washing out he hauled dirt in to save his driveway. The water was undermining the banks of the ditch and the banks were caving in. Lauck was asked whether he had allowed the ditch to be filled up with trash and logs and crossties north of the bridge and south of Mr. Gilbert's property line. His answer was, "I'll answer this way. Under a plan I did." He admitted trash was dumped in the center of the ditch in certain spots. He said that ditch checks were put in, first there were logs that were cut right there along the

ditch, then there were old flower wreaths and stands that were in the holes. Limbs and trimmings were also put in the deep holes. He was asked if he had wooden stakes put in. His answer was, ''You have to have them to hold the ditch check.'' He admitted that he had poles put in the ditch to hold the banks and to hold the ditch checks.

Lauck stated that there was considerable water that came through that ditch during torrential rains. He stated that he had built some retaining walls along the sides of the ditch; and he had built three or four ditch checks across the ditch north of the bridge. He stated that he had let the honeysuckle vines grow up inside the ditch to stop the erosion. He admitted that the ditch checks could have been built up above the flow of the water, and that the debris first dumped in before it settled could have been higher than the ditch check. He stated that he had not moved any of the ditch checks since December 13, 1960. He was asked whether he had dumped any additional debris in the ditch since that date. His answer was, ''I think we continued dumping in there a while.'' He was asked whether sand had filled in above the checks which he had built. His answer was, ''It is filled in with sand, yes, sir, and with what we put in there.'' He statetd that he did not touch any of the checks or retaining walls after the suit was filed, because he was afraid it would have some effect on the suit. He recognized that he had a water problem, and he appealed to Mr. Freeman to come in and advise with him about the matter. From looking at the terrain he thought that part of the ditches on Mr. Gilbert's property should have been continued on in a southwesterly direction, and he asked Mr. Gilbert to check into the building of a ditch straight through there; he knew that that kind of ditch would not eliminate the ditch through the cemetery; but he thought it would help him to stop the erosion. Lauck stated that

Mr. Gilbert complained along in 1959 or 1960 when they were having torrential rains in that area. He stated that he did nothing to the ditch prior to 1959 except let the honeysuckle grow. He stated that he put the ditch checks in there to stop the ditch from washing out and to protect his property.

At the conclusion of the evidence the chancellor dictated into the record his findings of fact and his conclusions of law. The chancellor found that the undisputed facts in the case showed that the complainant and his predecessors in title for many years prior to the filing of the complainant's original bill had ditches that adequately carried off the water through ditches "A", "B", "C" and "D", according to Exhibit "A" to the direct testimony of Mr. Gilbert; that the undisputed testimony was that Ditch "A" on the complainant's land, prior to the time of the actions complained of by the complainant, was adequate to carry off all of the water into Ditch "E" across the defendant's land, and that no obstruction was placed in or allowed to grow in Ditch "E" that would in any way interfere with the flow of water from the complainant's land. The chancellor found that the testimony of Mr. Gilbert was to the effect that around the year 1957 or 1958 the flow of the water in Ditch "E" was interfered with to such extent that the complainant's ditches, from the point of their intersection with the defendant's land north and northeast, began to fill up to such an extent that a bridge over the ditch on the complainant's land at or near the point of intersection of ditches "A" and "B" was completely covered over by the sand and silt, and that in spite of repeated efforts on the part of the complainant to reopen his ditches the ditches continued to fill up.

The chancellor found that both Mr. Freeman and Henry E. Damon, a civil engineer who was called to testify as a witness on behalf of the defendant, had testified that there was adequate fall insofar as the lay

of the land was concerned to allow the water to flow through Ditch "E" if no obstruction were placed in the channel of the ditch; and the chancellor found that, notwithstanding the defendant's contention that no action on his part in regard to Ditch "E" had caused the silting up of the complainant's ditch extending northwardly from the point of intersection with Ditch "E", yet the undisputed proof showed that it did silt up and fill in all the way from the north line of the cemetery property to a point beyond the intersection of ditches "A" and "B" on the complainant's land.

The chancellor found that the defendant by his own actions or the actions of his employees had caused many foreign articles, trees, posts, bushes and rubbish in general to be placed in that portion of Ditch "E" immediately south of the north fence line of the defendant's property, and that the defendant had allowed undergrowth to accumulate in such quantity that in the court's opinion it would check the free flow of water into and through Ditch "E"; and although the size of the ditch and the fall of the ditch may, in and of itself, have been adequate if kept clean, it was not; and the court was of the opinion that this foreign matter and natural growth, which could have been eliminated and kept down, checked the flow of the water to such an extent that it caused the natural dropping of the silt and sand in the complainant's ditches up to the intersection of ditches "A" and "B" and farther north and northeast as well.

The chancellor was of the opinion that the relief prayed for in the complainant's bill should be granted insofar as cleaning out Ditch "E" was concerned, except as to the culvert mentioned in the amendment to the original bill which, according to the testimony of Mr. Freeman and Mr. Damon, was adequate to carry the flow of water, although there was evidence in the record which indicated that the culvert was inadequate

under certain extreme circumstances. The chancellor was of the opinion that the complainant himself would have to do the necessary re-digging of the above mentioned ditches on his own land and that he should be compensated for such expense, and that he should have judgment against the defendant for the sum of $1500 to defray the cost thus incurred. The chancellor did not feel that the court should grant any further relief to the complainant insofar as damages were concerned, although the court was convinced that the plaintiff had suffered damages other than the expenses to be incurred in cleaning out the ditches. The chancellor did not feel that the defendant's offer to do equity was made in good faith, because it was neither reasonable nor practical and would cause the complainant to divert the water from its natural water course and across the complainant's own land, denying him the right that he had acquired by prescription to the use of Ditch ''E'' and that portion of Ditch ''B'' which crossed the defendant's land.

The chancellor was of the opinion that the defendant should be ordered to clean out his ditches and maintain them as prescribed by Mr. Freeman so that they would no longer interfere with the complainant's rights and use of his property.

A decree was therefore entered adjudging that the defendant be enjoined permanently from maintaining the ditches on his property in such manner as to obstruct the flow of water through said ditches and thereby causing complainant's land adjoining the defendant's land to be damaged in the future; and the defendant was further ordered to perform such work on and in the ditches running through his property which drained the land of the complainant ''as may be necessary in accordance with the recommendations of Mr. E. E. Freeman, as set forth in his testimony in this cause.'' It was further ordered that the defendant be granted sixty

days from the date of the rendition of the decree "to bring the aforesaid ditches up to the standards set by Mr. Freeman." It was further ordered that the complainant have and recover from the defendant the sum of $1500 as damages.

The appellant has assigned and argued four points as ground for reversal of the decree of the lower court, as follows:

1. That the court erred in its holding that the appellant was responsible for any damages to the appellee.

2. That the court erred in awarding damages to the appellee, since the appellee offered no evidence as to the rental value of the land of which he was deprived of use.

3. That the court erred in requiring the appellant to enlarge the ditch on the cemetery property to conform to the requirements of the witness Freeman; and

4. That neither the pleadings nor the proof showed charge of negligence.

The appellee has filed a cross-assignment of errors in which it is contended that the court erred in not awarding to the appellee all damages proved by the appellee in the court below.

■■ We think there is ample evidence in the record to support the chancellor's finding that the obstruction by the appellant of the flow of water through Ditch "E", as shown by the testimony and the photographs introduced in evidence, checked the flow of water through the appellee's ditches "A" and "B" to such extent as to cause the two ditches to be filled up with silt and sand up to and beyond the intersection of the two ditches, and we think the chancellor was justified in awarding damages in the amount of $1500 to the appellee. ■■■ We also think there was no error in the chancellor's finding that the appellee was entitled to a mandatory injunction requiring the defendant to remove the obstructions to the natural flow of water through the ditches

on his land described in the decree, and permanently enjoining the defendant from obstructing the natural flow of water through said ditches in such manner as to cause the complainant's lands adjoining the defendant's lands to be damaged in the future.

██ █ That part of the decree awarding injunctive relief, however, must be reversed and the cause remanded in order that the decree may be made more specific as to what the appellant is required to do or not to do under the injunction. Illinois Central Railroad Company v. George, 241 Miss. 233, 130 So. 2d 260 (1961). As stated by Judge Griffith in his Mississippi Chancery Practice, 2d Ed., section 449 (1950), ". . . while the writ is issued by the clerk * * * ██ █ it is highly important that the writ be drawn exactly as allowed by the fiat and that it be so clear and explicit on its face that it will distinctly inform the defendant just what he is enjoined from doing or commanded to do. ██ █ The defendant will not be required to obey an obscure writ, nor will he be obliged to resort to the bill to ascertain the details of what was intended by the writ."

██ █ The authorities all agree that one whose property has been injured or destroyed by water, due to the wrongful act or omission of another, may maintain an action for the recovery of the damages sustained. ██ █ Also, the wrongful flooding of land may be enjoined, in a proper case. Such flooding has frequently been restrained on the ground that it constituted a continuing or recurrent trespass or nuisance. 56 Am. Jur., Waters section 442 (1947).

In 93 C. J. S., Waters section 114a(4) (1956), it is said:

The upper owner of land has the right, without interference, to have the flow of surface water follow along a well-defined watercourse from his land. Where surface water has been accustomed to gather and flow along a well-defined channel, which by frequent run-

ning it has worn into the soil, it has been held that it may not be obstructed to the injury of the dominant proprietor, but the upper owner cannot prevent interference with the drainage of surface water unless the servitude be clearly and permanently impressed on the property. Where a ditch is constructed across the lands of two adjacent proprietors in accordance with the natural flow of water, neither can disregard the rights of the other by changing the course of such water.

In the early case of Ferris v. Wellborn, 64 Miss. 29, 8 So. 165 (1886), the Court held that a riparian owner has the right to have a natural water course which drains his lands adjacent thereto remain unobstructed and as nature made it, in its course onward through the lands of another. The record in that case showed that Prairie Creek was a natural channel, one-half or three-fourths of a mile long, with well-defined beds and banks, of varying width, through which water was conveyed and discharged into the low land adjacent to Plum Creek. It was undoubtedly a water course whenever there was water to run in it, and the Court held that the fact that most of the time it was dry or not running was not enough to deprive it of the character of a water course with its incidence, among which was the right of a riparian owner to have it remain as nature made it as a drain for the adjacent land.

In Liles v. Cawthorn, 78 Miss. 559, 29 So. 834 (1900), the Court said:

" 'Water runs, and ought to run, as it was wont to run' is a principle of the common law. Every proprietor of the soil through which a stream passes, has a right to have it run in its natural current without diminution or obstruction."

In Palmer v. Massengill, 214 Miss. 379, 58 So. 2d 918 (1952), the Court said:

"A natural water course is one which has a well defined bed and banks of varying width and depth, through which water is conveyed and discharged into some substantial reservoir or body of water. Ferris v. Wellborn, supra; Belzoni Drainage Commission v. Winn, 98 Miss. 359, 53 So. 778 (1910). It is not necessary that there be a continual flow."

In the case that we have here the record shows that the ditch referred to as Ditch "E" running through the appellant's land was a part of a natural water course which drained a small but well-defined drainage area extending from Lost Gap Road on the north to Fairchild Creek south of old Highway No. 80. The ditch had a distinct channel with well-defined banks, cut through the turf and into the soil by the flowing of water; and up next to the bridge referred to in the pleadings the ditch was 12 or 13 feet deep. It can be readily seen that the ditch had all of the characteristics of a natural water course.

The record shows that the lateral ditch running southwestwardly across the corner of the appellant's 6-acre parcel of land identified on Damon's plat as Parcel 3, had been in existence for a period of at least 17 years at the time of the trial; that the ditch followed closely the natural flow of the water in the drainage area; and we think there is ample evidence in the record to support the chancellor's finding that the appellee had acquired a prescriptive right to have it run in its natural course without obstruction.

In discussing the measure of damages which a landowner is entitled to recover for injuries to his land caused by the wrongful obstruction of the flow of water along a well-defined water course, the textwriter in 56 Am. Jur., Waters section 40 (1947), says:

The damages to be recovered for the obstruction of or other interference with natural watercourses depend not only on the kind of action brought, that

is, whether it is for temporary or permanent damages, but also upon the character of the injury or nuisance as temporary or permanent. In actions by riparian owners for damages for injuries occasioned by interference with the flow of a stream, as in other actions for injuries to real property, the damages are, as a general rule, measured by the diminution in the market value of the property, where the injury is of a permanent nature. In the case of temporary or occasional injuries the measure of damages is the diminution in the rental value of the property, or, according to the rule in some jurisdictions, the cost of restoring the land to its former condition, when this is less than the diminution in the market value of the whole property by reason of the injury.

It is earnestly contended on behalf of the appellee in his cross-assignment of error that the court erred in refusing to allow the items of special damages enumerated in his bill of complaint aggregating the sum of $8,507.15. The items referred to include items of expenditures by the appellee for seed, fertilizer and labor used in the planting of 10 acres of land in improved grasses during the spring of each of the years 1957, 1958, 1959, 1960 and 1961, and in the planting of oats, crimson clover and rye grass during the fall months of each of those years, and also items of expenditure for the repair of tractors and the renting of a 40-acre pasture from a Mr. Hamilton for the grazing of cattle, and the purchase of hay, cotton seed meal, ground corn, and other feed for cattle. The appellee testified that his attempt to grow improved grasses, including oats, rye grass vetch and clover, during the year 1957, "was absolutely a flop;" that the crop drowned, the seed soured, and he had nothing to show for the seed, fertilizer and labor which he had expended; and that the result was about the same for each of the next four years.

██ █ But we think it cannot be said that the court erred in refusing to allow as damages the items mentioned above. The appellee was not entitled to recover as special damages the amounts of money which he had improvidently expended for seed, fertilizer and labor during the several years mentioned above in an attempt to grow improved. grasses on land which he knew was subject to overflow during the planting and growing seasons and unfit for the growing of improved grasses or the production of hay.

It is fundamental that, in order to maintain an action for damages for injuries claimed to have been caused by a negligent or other tortious or wrongful act or omission, it be made to appear that such act or omission was the proximate cause of the injuries complained of . . . . 15 Am. Jur., Damages section 18 (1938).

There are numerous decisions which lay down the general rule that one whose riparian rights are interfered with, or whose property is flooded because of the obstruction of a natural watercourse, must exercise reasonable care and diligence to minimize the damages, and if any part of his damages is the result of his own failure ·to exercise such care and diligence, whatever may be stated to be his measure of damages, to that extent, at least, he is not entitled to recover. 56 Am. Jur., Waters section 41 (1947).

We do not have here a case where growing crops have been damaged or destroyed by the wrongful acts of the defendant.

In the case of the City of Oxford v. Spears, 228 Miss. 433, 87 So. 2d 914 (1956), the Court held that, where the proof in a suit against the city for damages for polluting a water course running through the plaintiff's land with raw sewage, rendering the water unfit for the plaintiff's cattle to drink, showed .an abatable nuisance, damages should have been limited to depreciation

of the rental or usable value of the land for the six-year period ending with the filing of the suit, plus any special or incidental damages sustained and proved, and the plaintiff could not recover for loss of profits in his cattle business as an element of the damage.

 ██ The appellee was entitled to recover damages for the diminution in the value of the use of his land during the years mentioned above to the extent that such diminution in the value of the use of the land was proximately caused by the wrongful acts of the appellant, and also such other special or incidental damages as he might be able to prove. Such damages in our opinion would include damages to cover the cost of reopening the ditches on his own land, which had been filled with silt and sand as a result of the unlawful obstruction by the appellant of the flow of water, as alleged in the appellee's amended bill. Such damages, however, would not include the cost of seed, fertilizer and labor expended by the appellee in a vain effort to grow improved grasses on land which he knew was swampy and wet and unfit for the growing of improved grasses because of the lack of proper drainage.

In Young v. Extension Ditch Co., 13 Idaho 174, 89 P. 296 (1907), the plaintiff Young sued the defendant Ditch Company for damages alleged to have been sustaind during the three years preceding the commencement of the action, for alleged injuries to about 50 acres of farm land by the discharge of an excessive amount of water over and on said land. The plaintiff alleged that the ditch designated as a "waste ditch", had been constructed by the Ditch Company in a careless, negligent and unworkmanlike manner; that because of the water from said ditch flowing upon the 50 acres of land certain ponds and lakes had been formed on the land, and the water had made the same wet and swampy, too wet to raise a crop. The Court held that, where the land was not injured but the owner was pre-

vented from raising a crop, the rental value of the land was the proper measure of damages. In the case of Quinn v. Chicago M. & St. P. Ry. Co., 23 S.D. 126, 120 N.W. 884 (1909), the Court held that where no crop was raised on land because of the wrongful act of one backing water on it, the measure of damages was the rental value of the land, though the same was in the possession of a tenant required to pay a portion of the crop as rent. See also Gentry v. Richmond & D. R. Co., 38 S.C. 284, 16 S.E. 893 (1893).

The chancellor was the trier of the facts, and in view of what has been stated above, we think it cannot be said that the chancellor was manifestly wrong in refusing to allow damages to the complainant in an amount in excess of the $1500. The chancellor heard the testimony and examined the numerous photographs and other exhibits which were offered in evidence, and was in a much better position to evaluate the testimony of the interested parties than we are. The chancellor was of the opinion that the damages claimed by the appellee included many items of expenditures which he was not entitled to recover under the rules of law applicable in cases of this kind. We are unable to say that the amount of damages awarded were so grossly inadequate as to justify this Court in substituting its judgment for that of the lower court.

For the reasons stated above that part of the decree of the lower court awarding damages to the appellee in the sum of $1500 will be affirmed on direct appeal and on cross-appeal; that part of the decree directing that the appellant be enjoined from maintaining the ditches on his land in such manner as will cause the complaiant's property adjoining the defendant's property to be damaged in the future, and further ordering that certain work be performed on the ditches running through the defendant's property in accordance with the recommendations of E. E. Freeman, as set forth in

his testimony, will be reversed and the cause remanded so that the decree may be made more specific as to what the appellant is required to do or not to do under the injunction.

■■ ■ Inasmuch as the appellant is obtaining substantial relief from the decree appealed from and the decree is being affirmed only in part, the costs should be paid one-half by the appellant and the other half by the appellee. And it is so ordered. Illinois Central Railroad Co. v. George, supra.

Affirmed in part and reversed in part on direct appeal and affirmed on cross-appeal, and cause remanded.

All Justices concur.