451 So.2d 201 (1984)
GEORGIA PACIFIC CORPORATION, et al., Appellants,
v.
L.A. ARMSTRONG, Appellee.
No. 54750.
Supreme Court of Mississippi.
April 25, 1984.
*203 James B. Everett, Decatur, for appellants.
Calvin R. King, Durant, John D. Guyton, Thornton, Guyton, Dorrill & Pettit, Kosciusko, for appellee.
Before PATTERSON, C.J., and PRATHER and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This is an action against a lower riparian landowner and a timber company whose logging operations are said to have impeded the natural flow of waters off an upper riparian landowner's property. The Chancery Court of Attala County awarded Plaintiff, L.A. Armstrong, $12,000 in damages for injuries done to his farm by the flooding and enjoined further injury.
The Defendants, Georgia Pacific Corporation and Eleanor Scruby, now challenge the Chancellor's ruling as to liability, the measure of damages used, and the form of the injunction. Finding no reversible error, we affirm.

II.
L.A. Armstrong owns a 400 acre farm in Attala County. It is drained, in part, by a man-made ditch known as the Okebo Canal.[1] To the west of Armstrong's farm is a timber tract owned by Mrs. Scruby, one of the Defendants in this lawsuit. She is Armstrong's lower riparian landowner. The Okebo traverses her land for a distance of about half a mile. The drainage provided by the Okebo Canal is at the heart of this lawsuit.
On November 9, 1977, Mrs. Scruby deeded part of her timber to Georgia Pacific Corporation, Defendant below and Appellant here. The timber deed contained an indemnity clause wherein Georgia Pacific agreed to hold Mrs. Scruby harmless for any damage done to third parties by the logging operation. The removal of the timber was to take place within three years. The James Vardaman Company was to supervise the operation on Mrs. Scruby's behalf.
All of the hardwood timber included in the deed was in the vicinity of the Okebo. Georgia Pacific sold this timber to Koppers Logging Co. which removed it from Scruby's land in 1978 and 1979. To facilitate their operations, Koppers constructed three or four log crossings on the Okebo. Each consisted of five or six logs placed in the canal parallel to its banks which were then covered with dirt. After the timber had been removed, Koppers neglected to dismantle its bridges. Moreover, a substantial number of treetops were left by Koppers which obstructed the flow of the canal.
Following the logging operation on Mrs. Scruby's land, Armstrong's farm began to flood more than it had in the past. In 1979 and 1980, Armstrong was unable to plant ten acres of his land in soybeans, as he normally did, due to standing water in his fields which the Okebo no longer carried away. Portions of his land had always been subject to periodic flooding. Prior to the logging operation, however, the water would drain off in a matter of days. Afterwards, it would remain in Armstrong's fields for longer periods of time.
In 1980, Armstrong dredged his portion of the Okebo and built levees with dirt from his own fields to contain the excess water. The levees occupied about three acres that he had been able to farm previously, *204 and he removed the topsoil from another acre and a half to build the banks. Now, after heavy rains, the Okebo rises above the level of his fields by about three feet. If the levees broke, his fields would flood again.
The record reveals that the tracts of land at issue are located in the Yockanookany River bottom which has been subject to periodic flooding for as long as anyone can remember. The original land grant describes the area as low and marshy, and in more recent times, the land in question has been included within the flood hazard boundaries established by the Department of Housing and Urban Development.
Armstrong admits that his farm normally floods two or three times a year during periods of excessive rainfall. The record shows that in 1979 and 1980, rainfall in the region was respectively 86.7 inches and 59.77 inches. It rained 22 inches in April and May of 1979, and in 1980, 13 inches of rain fell in the same two months. 1979 was the year of the great Easter Flood, when an unprecedented amount of rain swamped this and other regions. It is also undisputed that beavers have been active on Scruby's land and except for the two years of the logging operation, they have built dams routinely in three or four places.
A substantial number of slides and photographs of the Okebo were introduced at trial by both sides in their attempts to show the proximate cause of Armstrong's inadequate drainage. By stipulation of the parties, the Chancellor visited the portion of the Okebo that traverses Armstrong's and Scruby's land.
In his judgment, the Chancellor specifically found that
"the water flow of the Okebo Canal, where it traverses defendant Scruby's land, was substantially impeded by the defendant, Georgia Pacific Corp., allowing a number of trees, in excess of six inches in diameter, to fall and remain in said Okebo Canal on the defendant Scruby's land and that the defendant, Georgia Pacific Corp., negligently allowed the trees to remain in Okebo Canal and that as a result of said negligence on the part of the defendant, Georgia Pacific Corporation, the flow of Okebo Canal was substantially diminished to the extent that water was allowed to stand on the plaintiff's land, the upper riparian land owner, . .. and that as a result of the negligence the defendant, Georgia Pacific Corporation, the same being the sole proximate cause thereof, the plaintiff, L.A. Armstrong, suffered damages for the loss of full use and permanent injury to certain portions of his farmland and further damages for the cost of bulldozer work in mitigating further damage to his land in the total sum of $12,000... ."
Finding that the plaintiff was substantially certain to suffer further irreparable future damage to his farmland, the Chancellor also issued a mandatory injunction. He ordered the Defendants to restore that portion of the canal that traverses Scruby's land to its condition prior to the timber cutting by Georgia Pacific. Eleanor Scruby was given attorney's fees pursuant to the indemnity provision of the timber deed, a point not challenged here.

III.
The issues tendered on this appeal at their core concern findings of fact. Here as always we scrupulously regard our restricted scope of review.
Findings of fact made by a chancellor may not be disturbed or set aside on appeal unless manifestly wrong. Cheek v. Ricker, 431 So.2d 1139, 1143 (Miss. 1983); Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983); Buchanan v. Hurdle, 209 Miss. 722, 725, 48 So.2d 354 (1950); Griffith, Mississippi Chancery Practice § 674 (2d ed. 1950).
In Peoples Bank and Trust Co. v. L & T Developers, 434 So.2d 699 (Miss. 1983), we defined with some precision our scope of appellate review:
Our scope of review of findings of fact made by a chancellor is, as all well know, quite limited. We must consider the evidence in the light most favorable to the *205 party in whose favor the fact findings were made. We must also give that party the benefit of all reasonable favorable inferences which may be drawn from the evidence. If when we do this we find that there is substantial evidence which supports the finding of fact made by the chancellor, we must affirm. 434 So.2d at 704-705.

IV.

A. Liability
Waters obey the laws of physics, principal of which are the laws of gravity. Hall v. Wood, 443 So.2d 834, 838 (Miss. 1983). Back at the turn of the century, Liles v. Cawthorn, 78 Miss. 559, 29 So. 834 (1900) put the point differently. "`Water runs, and ought to run, as it was wont to run' is a principle of the common law." 78 Miss. at 564, 29 So. at 834. The burdens and benefits of waters must be shared fairly and equitably by neighboring landowners. Hall v. Wood, 443 So.2d at 838-840.
In this context our law has long provided that an upper riparian landowner has the right to have a water course which drains his lands remain unobstructed in its course through the lands of another. Ferris v. Wellborn, 64 Miss. 29, 8 So. 165 (1886); Lauck v. Gilbert, 252 Miss. 371, 394, 173 So.2d 626, 637 (1965).
If a lower riparian landowner obstructs the flow of a stream or water course, thereby causing his upper riparian neighbor's lands to flood, the latter may secure judicial relief. Hall v. Wood, supra, 443 So.2d at 838-840; Lauck v. Gilbert, supra, 252 Miss. at 393, 173 So.2d at 637. In such cases, the burden is upon the plaintiff to show that the acts of the lower riparian landowner were a substantial contributing cause of the damages he suffered.
Redress may take the form of an award of damages, temporary or permanent, or both, and an injunction, mandatory or prohibitory, or both, as may be appropriate. Hall v. Wood, supra, 443 So.2d at 841-842; Lauck v. Gilbert, supra, 252 Miss. at 393, 173 So.2d at 638-640. The chancellor may provide for such other redress as may be equitable and proper under the facts and circumstances of the particular case. Hall v. Wood, supra, 443 So.2d at 842-843.
Not only does Plaintiff Armstrong invoke his common law rights as an upper riparian landowner, he also calls our attention to Miss. Code Ann. § 97-15-41 (1972) which provides, inter alia:
"It shall be unlawful and a misdemeanor for any person, firm, corporation, association or organization to push, fell or cut trees in excess of six (6) inches in diameter, into a running stream, or deposit or leave a running stream, trees, in excess of six (6) inches in diameter, logs in excess of six (6) inches in diameter or tree tops, without removing the same immediately, in such cases where such will materially impede the flow of or navigation upon such running stream ..."
Riparian landowners, as well as those interested in navigation, are among those for whose protection this statute has been enacted. As such, riparian landowners may predicate a claim for relief on a substantial deviation from the declaration of law contained in the statute.
Here, the Chancellor not only found that the Defendants had violated the rule of law codified in Section 97-15-41; he further found that such violations were the sole proximate cause of the flooding experienced by L.A. Armstrong. Included by unavoidable implication is a holding that Defendants violated their common law duty to refrain from creating a nuisance in the form of excess flooding on Armstrong's land.
At first glance, it would appear from the record that an apportionment of damages would be appropriate here because of the excessive rainfall in 1979, the natural erosion of the canal and the beaver activity. However, upon closer scrutiny, the evidence, along with favorable inferences, is legally sufficient support to the Chancellor's *206 holding that the Defendants' logging operation[2] was the sole proximate cause of Armstrong's inadequate drainage. The heaviest rainfall in the two years in question occurred about a month before the planting season for soybeans. There would normally have been plenty of time for the waters to drain before planting. The beavers, active long before the timber cutters ever moved into the area, had never caused water to stand in Armstrong's fields as it did in 1979 and 1980. Beyond that, it is unlikely that natural erosion could have been responsible for the sudden and substantial change in the capacity of the Okebo to carry the water off of the Plaintiff's fields.
Armstrong testified that prior to the timber cutting operation, the flood waters would drain off of his land in four or five days, and that afterwards, the water would stand in his fields for much longer periods of time. The Chancellor, who unlike ourselves was able to personally view the Okebo Canal, was in a far better position to determine whether this inadequate drainage was due to the obstructions left in the canal by Koppers. There is sufficient evidence in the record to support the Chancellor's finding that the actions of the Defendants were the sole proximate cause of the additional flooding experienced by Armstrong. We decline to disturb his finding in this regard.

B. Damages
The next error assigned by Georgia Pacific concerns Armstrong's proof regarding the damages allowed by the Chancellor. Armstrong bore the burden of proving by a preponderance of the evidence that the damages he suffered were proximately caused by the conduct of the Defendants. Beyond this, he bore the burden of establishing that the damages he was seeking were allowable by law.
Clearly, the costs of building the levees to mitigate further damage were recoverable. Armstrong had a duty to mitigate his damages. If he had failed to do so, he could not have recovered for any damage suffered by him as a result of his own inaction. Watson Oil Corp. v. Cavanaugh, 294 So.2d 784, 786 (Miss. 1974); Lauck v. Gilbert, 252 Miss. 371, 173 So.2d 626 (1965). Mitigation damages proved by Armstrong at trial include the cost of the bulldozer work, ($4,800), the value of the land now occupied by the levee, and thus rendered uncultivatable ($3,000) and the reduction in value of the 1 1/2 acres from which the soil was taken to build the levees ($1200). See, e.g., Sun Oil Co. v. Nunnery, 251 Miss. 631, 648, 170 So.2d 24, 31 (1964). Thus $9,000.00 of the damages awarded by the Chancellor were allowable under the law and established in fact.
In search of support for the remaining $3,000.00 of the Chancellor's $12,000.00 damage award, we turn to Armstrong's claimed crop losses for 1979 and 1980. Here we are concerned only with a temporary injury to Armstrong's land. Armstrong claimed that his inability to plant 10 acres of his land in beans cost him $2,500.00. He arrived at this figure by estimating the number of bushels that the land had produced per acre, and multiplying this figure by the acreage and the price he got for his beans in those two years. He then subtracted 50% of the total amount, which would have been his costs.
Georgia Pacific takes issue with the manner in which Armstrong proved his damages claiming that the true measure is the depreciation in fair market rental value of the land for the time it was idled by the conduct of the defendants. We agree. See, e.g., City of Oxford v. Spears, 228 Miss. 433, 439, 87 So.2d 914, 916 (1956).
However, we are of the opinion that such value is determined by a combined consideration of the market data and income approaches. Armstrong's evidence on this point reflected net income losses. *207 Utilizing the income approach, he could recover net income under typical management for the years at issue. His evidence was minimally adequate to support an additional $2,500.00 damage award.
The proof thus establishes $11,500.00 in actual damages suffered by Armstrong. Considering the lack of precision in the dollar amount of these damages, even though we find them to have been established with reasonable certainty, the Chancellor's overall determination that Armstrong had suffered damages in the aggregate amount of $12,000.00 is beyond our power or inclination to disturb.
In this view we need not reach the question whether Armstrong had proved permanent injury to his land (beyond the excavation and levee work). Suffice it to say that the alleged increased threat of flooding, to the extent that it may have been caused by the Defendants, should disappear after the mandates of the Chancellor's injunction have been complied with.

C. Injunctive Relief
The final assignment of error relates to the form of the mandatory injunction. The Defendants have not challenged the fact that an injunction was issued, nor could they. See, e.g., Hall v. Wood, 443 So.2d 834, 840-842 (Miss. 1983); Lauck v. Gilbert, supra, 252 Miss. at 392-93, 173 So.2d at 636. They claim rather that the injunction is too vague and indefinite in form, that it may require them to eliminate drainage problems beyond those they caused.
The general rule governing the form of an injunction is as follows:
A decree should be complete within itself,  containing no extraneous references, and leaving open no matter or description or designation out of which contention may arise as to the meaning ...
Morgan v. U.S.F.G., 191 So.2d 851, 854 (Miss. 1966); See also, Stinson v. Barksdale, 245 So.2d 595, 597 (Miss. 1971); Rule 65, Miss.R.Civ.P.
Here, the Defendants were mandatorily enjoined
"to forthwith remove all cut timber and treetops and silt, as well as other obstructions, which have built up as a result of same, from that portion of the Okebo Canal that traverses the Eleanor Scruby tract, in Attala County, Mississippi, to the extent of restoring that portion of the canal to its condition prior to the timber cutting by Georgia Pacific Corporation on said Eleanor Scruby tract;"
This injunction was more specific than that approved in Hall v. Wood, supra, 443 So.2d at 840-842.
Considering all of the conflicting testimony at trial over whether the logs had been cut by a saw or not, it is clear that Defendants are to remove only those obstructions from the canal that were cut with a saw or were used to build the bridges complained of, and the silt or other obstructions that have accumulated thereon. The evidence shows that prior to the timber cutting operation, the condition of the canal on Mrs. Scruby's land was in some state of disrepair due to beaver activity in the area and natural erosion. The injunction does not require Georgia Pacific to remedy the damage done to the canal by natural causes. Therefore, the injunction, as written, will not be disturbed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER and SULLIVAN, JJ., concur.
NOTES
[1] The Okebo used to be a small creek meandering through approximately the same area that it now traverses. In 1929, a drainage district was created and through the monies it collected, a straight ditch was dug. Before the canal was finished, the drainage district ran out of money, and now it runs into the Yockanookany Canal just west of Mrs. Scruby's land on a tract owned by her sister, Mrs. Harris. Though fed by natural springs, the Okebo has a minimal flow except during periods of heavy rainfall. No maintenance work has been conducted on the canal since its construction, except by private landowners.
[2] As indicated above, the logging operation was in fact conducted by Koppers' Logging Co. Georgia Pacific and its indemnitee, Eleanor Scruby, are responsible to Plaintiff Armstrong for Koppers' defaults.