Herman F. HAISCH, Jr., et al., Plaintiffs,

v.

SOUTHAVEN LAND COMPANY, Inc., Defendant.

No. DC6553.

United States District Court
N. D. Mississippi,
Delta Division.

Oct. 10, 1967.

J. E. Hamer, Jr., and L. Hamer Mc-Kenzie, of McKenzie & Hamer, Ashland, Miss., for plaintiffs.

Arthur E. Huggins, of Houston, Huggins & Hamberlin, Southaven, Miss., and Nat G. Troutt, Senatobia, Miss., for defendant.

## OPINION OF THE COURT

CLAYTON, Chief Judge.

During the lifetime of Herman F. Haisch, he and his wife, Lillian Haisch, each owned an undivided one-half in-

terest in the land which is the subject of this action.[1] Since the death of Herman F. Haisch, his son, Herman F. Haisch, Jr., is the executor of his father's estate which is now being administered in the Probate Court of Shelby County, Tennessee. Lillian Haisch also owns an interest in the other undivided one-half interest in the property which belonged to Herman F. Haisch at the time of his death.[1] The widow and the executor are, respectively, complainant-intervenor and substituted complainant (hereafter plaintiffs), and Southaven Land Company, Inc., is the sole defendant.

In 1951, Herman F. Haisch, deceased, bought the land with which we are concerned which consists of slightly less than 100 acres of unimproved land. The Haisch property is bounded on the east by U. S. Highway 51 which has been in its present location for many years and by other privately owned property. State Line Road, which runs generally east and west, marks its northern limits for present purposes. (There are some small holdings along the south of this road, held by strangers to this suit.) The western boundary of the Haisch property is the right-of-way for Illinois Central Railroad. It runs generally north and south. Defendant owns land which is immediately adjacent to the Haisch property on the south. Before the time with which the complaint is concerned, drainage generally was from north to south across State Line Road onto the Haisch property and from east to west across Highway 51 onto the Haisch land. Three separate natural water courses converge generally in the west center of the Haisch property, making a single stream which flows south, through the Haisch property, and then generally west to empty into Horn Lake Creek, and, thus, to flow with that creek eventually into the Mississippi River. The westernmost of these three streams drains a watershed area from the north of approximately 200 acres or less. None of this land has been improved or changed by defendant. This stream crosses State Line Road under a county bridge. The middle stream serves a watershed to the north and east of the Haisch property in which defendant did own about 42 acres. This stream also crosses State Line Road under a bridge which was built and is maintained by the county. It begins in Tennessee, west of Highway 51 which it crosses in Tennessee from west to east, and then courses for some distance southwardly and is joined by other streams before turning westwardly to cross said highway a second time, but this time from east to west. It then flows generally southwest and onto the Haisch land.

The third and easternmost stream originates east of the highway where it is joined by several other streams. It drains a watershed of about 400 acres, most of which was owned by defendant. It crosses the highway in Mississippi from east to west and flows onto plaintiffs' land to join the other two streams.

The watershed or drainage area from which water has always entered the Haisch property by way of these three streams is more than 1,000 acres and was said to be approximately 1,200 acres by one engineer witness. Before defendant acquired any acreage in this watershed area, most of the land in it was unimproved with natural vegetation, grasses and other growth thereon, but some severe erosion was present. Some rainfall was absorbed by percolation. The rest by way of natural slopes, valleys and drains was collected in and moved through the aforementioned three water courses. There can be no doubt that the movement of these waters then into said streams was slowed by the aforesaid vegetation, grasses and growth.

1. This is the nature of each party's interest as contained in the pleadings and plaintiffs' brief. Plaintiffs' Exhibit No. 7, however, which is a warranty deed, shows a conveyance of this land to H. F. Haisch and his wife, Lillian Haisch, as tenants by the entirety with rights of survivorship. But, title to his land is not here involved.

About six years before this suit was filed, defendant land company acquired large holdings within this watershed area which they rapidly improved and developed into residential subdivisions. Natural topography within the watershed area was radically changed. Streets were laid out, graded and paved; storm sewers were installed; the principal branch, east of the highway, of the aforementioned easternmost water course was straightened (as was another, smaller branch); all of the branches of this water course, east of the highway, were enlarged by making them wider and deeper; feeder or lateral ditches were dug from these branches to accommodate the flow of water from the storm sewers; building lots were graded, many sloped to drain into said lateral ditches or water courses, others sloped to drain into the streets and some to drain both ways; houses were built and driveways thereto were paved, and people moved in and established homes. Other lands, drained by the middle stream, were dealt with by defendant in the same way, and thus, a populous, modern community came into being.

As a part of similar development of its land, which joins plaintiffs' land on its south,[2] defendant staightened, widened and deepened the main drainage stream which is formed on the Haisch property by the confluence of the aforesaid three streams, south of the Haisch property and to the south line thereof. This was done to accommodate the drainage of surface waters from the houses, driveways, streets and storm sewers of this part of defendant's residential-type development. Natural drainage of this area was principally from east to west, into the natural stream which was improved. Only about six acres of this land drained naturally, before its improvement, onto the Haisch property.

Plaintiffs' suit is for money damages and is bottomed principally on their claim that the aforementioned undertakings of defendant to the east and north of plaintiffs' lands increased greatly the volume of water discharged on plaintiffs' land and greatly increased the velocity of the flow thereof causing an accumulation of silt and debris where said waters are discharged onto the Haisch property. They also claim that the ditches on the Haisch property, by reason of defendant's actions, have been completely filled in and that erosion, caused by the spread of water beyond the capacity of said ditches to accommodate, is now taking place on the lowland of plaintiffs. They also claim that the enlargement and straightening of the stream south of their property increased the speed of the flow off of plaintiffs' land to such an extent that substantial erosion has occurred for about 500 feet onto plaintiffs' property. Defendant denies that their undertakings have caused any damage to plaintiffs' land and, additionally, it contends that if any damage was caused it is damnum absque injuria. On the issues thus made, the case was fully tried to the court and has been submitted on briefs.

## I.

In addition to those heretofore stated, facts relevant to a disposition of the issues here, about which there is no controversy, and as the court finds them to be, will be mentioned. The three bridges on Highway 51 were built when this highway was constructed about 30 or more years ago. They have not been changed. One of them is in Tennessee, and two are in Mississippi. State Line Road is entirely in Mississippi. It is a local road which is maintained by DeSoto County. Even before the activities of defendant began, Highway 51 and State Line Road would flood in this area during heavy rains. Such flooding has con-

---

2. Defendant first partially developed most, if not all, of this land (with which we are here concerned) as a prospective industrial-commercial area. But, that aspect of the project was abandoned, and this area was developed residentially as was other property of defendant.

tinued, but the evidence does not justify a finding that it occurs more often or in greater volume or that the periods of flooding are of longer duration.

Since about 1957, nothing had been done to clean or clear any of these water courses on the Haisch land. During his lifetime, Herman F. Haisch expressly refused to grant an easement to DeSoto County for the purpose of constructing a drainage ditch to alleviate the bad drainage situation on State Line Road which forms the north boundary of the Haisch property.

All plans for defendant's developments were prepared by competent engineers from accurate topographic maps and were all submitted to and approved by the governing authorities of DeSoto County before any work was done thereon by defendant. None of the natural water courses on defendant's property were destroyed, but nearly all of them were enlarged in width and depth, and some of them were straightened. Deeds conveying the residential lots by defendant describe each lot either to the center of one of the aforementioned lateral or feeder ditches or to the center of one of the enlarged water courses. No new entry for water onto the Haisch property was constructed by defendant. The watersheds were in no way enlarged. No land of defendant (with which we are concerned in this case) is in the watershed which is drained by the westernmost water course aforementioned. Less than 50 acres of defendant's developments are located in the watershed or drainage area which is drained by the middle water course. Approximately 252 acres of defendant's developed property are located in the watershed for the easternmost of the three water courses. And, as has been noted, only about five or six acres of defendant's development drain onto the Haisch property from the south. Defendant's land and developments comprise approximately 30 per cent of the acreage which goes to make up the entire watershed which drains onto and across the Haisch property.

## II.

██ Additional facts, as the court finds them to be from the evidence in the case, follow. The ditches under both the bridges across State Line Road, especially the easternmost of the two, regularly filled with sand and silt even before defendant acquired its property. The culvert or box-type bridge on Highway 51 in Mississippi, through which most of the water with which we are here concerned drains, regularly filled with sand and silt before defendant's development began. A number of witnesses who had actually farmed the Haisch property, before defendant came to the scene, testified that there had been no appreciable change in the Haisch property since defendant's development began. Because of their special knowledge, their evidence is very persuasive and convinces this court that there has been no substantial damage to the greater part of plaintiffs' land. Such damage, as may have been shown to the central low or bottom land area of this property, has been caused, to a large extent, by the failure to properly maintain and keep clean these water courses along the routes over which they flow across the Haisch property.

There has been some damage to the Haisch property along the banks of the lower reaches of said principal stream which was caused by the improvements made to the south of this property by defendant as aforementioned.

Undoubtedly, the velocity of the runoff of surface waters on defendant's lands was increased greatly by defendant's undertakings. Surface water runs more rapidly off of the roofs of houses, off of paved streets and paved driveways than it does off of land in its natural state which is covered with vegetation. Moreover, water moves more rapidly in ditches (such as the lateral or feeder ditches aforementioned) than it does across land in its natural state with vegetation thereon. Also, the collection of surface waters in improved and straightened and enlarged water courses moves more rapidly and in greater volume than it would in a natural water course (such

as the ones here) in an unimproved condition. This is especially true when such improved water courses are fed by lateral ditches of the type which were dug by defendant. However, it is to be noted that the leveling of residential-type lots and the creation of lawns thereon, as has been done here, would, to a limited extent, tend to impede or slow the flow of surface waters which fall thereon. Moreover, plaintiffs' claims that none of the drainage ditches or improved water courses were sodded or seeded to grass or grouted or maintained are not sustained by the evidence. Defendant did slope, sod, seed and grout the banks of these ditches and water courses, and it did and does continue to do a limited amount of maintenance work thereon.

In sum, damage to the Haisch property from the flow of water thereon from the northern and eastern developments of defendant has been minimal and is, in fact, no more than could reasonably be expected to occur as a natural result of the construction undertaken by defendant in the development of residential-type subdivisions. And, it is worth noting here that plaintiffs did not offer any alternative way—reasonable or unreasonable—by which defendant could have dealt with the drainage problems inherent in these developments.

### III.

To support their claims, plaintiffs place principal reliance on the Mississippi cases of Lauck v. Gilbert, 252 Miss. 371, 173 So.2d 626 (1965); Mississippi State Highway Commission v. Engell, 251 Miss. 855, 171 So.2d 860 (1965); Cowan v. Baker, 227 Miss. 828, 87 So.2d 74 (1956); Newton Coca-Cola Bottling Company v. Murphrey, 212 Miss. 823, 55 So.2d 485 (1951) and Steed v. Kimbrough, 197 Miss. 430, 19 So.2d 925 (1944). But, the facts in those cases are quite different from the case here. Lauck involved an obstruction to the flow of water through a large natural water course by the owner of servient property to the damage of dominant property. Mississippi State Highway Commission v. Engell dealt with the removal of topsoil and vegetation and the later removal of sand and clay for use as topping in highway construction which left the property upon which this work had been done in such a state as to cause surface water to run off onto Engell's land at an accelerated speed and to carry with it sand, dirt, mud, clay and debris (some of which had been left in piles) which is not the case here at all. Cowan involved a diversion of surface water by the elevation of a lot over which it previously had flowed in a diffused state. Newton Coca-Cola was concerned only with surface water which had been concentrated in an artificial manner and discharged on the land of Murphrey in volume. Before the work was done which caused this, the surface waters had flowed off of land in its natural state in a diffused condition in all directions, except toward the Murphrey property. No surface water from a new and different area has been cast upon the Haisch property by defendant. In Steed, surface water only was involved. There was no natural water course. Most of the land of the two adjoining property owners was located in a swale or depression with natural diffused surface water drainage going from the Steed land across the Kimbrough land. The owners of the Kimbrough land had constructed a line ditch (wholly on their property) with which they fended off diffused surface water by carrying it to a roadside ditch. Later, Steed dug ditches on his upper land which emptied into the Kimbrough ditch but did nothing to enlarge the ditch. On the contrary, he contended that the Kimbrough ditch should be enlarged by its owners, and when they declined to do so, he broke the lower banks of the Kimbrough ditch and cast his surface waters onto the Kimbrough land from his ditches in a more concentrated form and at greater velocity.

Plaintiffs also rely upon the case of Armstrong v. Francis Corporation, 20 N.J. 320, 120 A.2d 4, 59 A.L.R.2d 413 (1956), but such reliance is misplaced.

The holding of that case is directly contrary to the settled case law of Mississippi.

In a natural state, the three streams which flow onto the Haisch property each had well-defined banks, with beds of varying depth and width, through which surface water flowed for ultimate discharge in the Mississippi River. At least parts of these streams, perhaps the larger part of all, were sometimes dry, but such dryness matters not. All three were and are natural water courses as that term has been defined in this state. Ferris v. Wellborn, 64 Miss. 29, 8 So. 165 (1886); Belzoni Drainage Commission v. Winn, 98 Miss. 359, 53 So. 778 (1910) and Palmer v. Massengill, 214 Miss. 379, 58 So.2d 918 (1952). And, the facts as they are and have been found to be in this case make such cases as Board of Drainage Commissioners, etc., v. Board of Drainage Commissioners, et al., 130 Miss. 764, 95 So. 75, 28 A.L.R. 1250 (1923) and American Sand and Gravel Company v. Rushing, 183 Miss. 496, 184 So. 60 (1938), controlling.

*Board of Drainage Commissioners* was a suit by lower riparian owners and a drainage district to enjoin upper riparian owners and drainage districts from draining into the stream which commonly served all of the land involved. The theory of the lower riparian owners was that drainage from the upper riparian lands, by way of canals and ditches and natural water courses, overloaded the commonly used stream beyond its capacity and that they were entitled to have such overloading enjoined. A demurrer to the bill of complaint was overruled by the chancery court, and the case was appealed. The Supreme Court of Mississippi stated the dominant question in this way:

The determining question in the case is, whether or not the upper, or dominant, landowners upon a natural water course *may artificially collect and discharge the surface waters from their lands into the natural water course,* in good husbandry and furtherance of agriculture, in excess of the capacity of the stream, thereby flooding and damaging the lands of the lower, or servient, owners bordering on the natural water course. (Emphasis added.)

In deciding the case, this language was used:

After a careful consideration of the difficult question presented, we have decided to follow that line of decisions which hold that the upper owner may reasonably drain his surface waters into the natural water course, in good husbandry, and this right may be exercised by him without any qualification or limit; and if he thereby increase the flow of the stream beyond its capacity, which results in flooding and damaging the lower owner, such damage will be damnum absque injuria; damage without legal injury, for which no right of action will lie.

We think this is the better rule to adopt in our state, in view of the peculiar local conditions and topography to which the rule may be applied. We believe that in such a case where the upper or lower owner must necessarily suffer, it would be more reasonable and just to put the loss upon the lower owner, who, we may say, should have reasonably anticipated the drainage of the lands above him into the water course running through his land. The lower owners may have reasonably known that the upper owners would exercise their right at some time to drain their surface waters into the only water course available as an outlet.

*American Sand* originated as a suit filed by an upper riparian owner against the lower riparian owner whose lands were immediately downstream from those of the plaintiff. In considering an appeal from a jury verdict in favor of the upper owner, the Supreme Court, in describing the water course, in part said:

* * * In dry weather there is little or no running water in the stream, but after heavy rains the volume of water was generally such as to overflow into its valley. In such over-

flows the progress of the water downward was formerly somewhat slow or sluggish, owing to the gradual slope and the many crooks or bends in the channel, and the underbrush and other natural growth and obstructions in the valley.

Plaintiff had cleared his land and built on it but did nothing to the stream. About five years later, American began mining gravel in the stream bed and along the bank, commencing near the mouth of the stream and proceeding upstream until they had arrived at a point about 160 yards below Rushing's land. These operations caused a lake or pond generally along what had been the course of the stream, from 20 to 40 feet deep and from 200 to 400 feet wide. Considerable acceleration in the flow of the stream as it passed through Rushing's land resulted which, during overflow periods, caused the stream to cut across the bends and crooks through sandy soil and to make new but irregular channels of such depth and with cavings on the banks of such width and at such locations as to cause substantial damage to Rushing's land.

The judgment in favor of Rushing was reversed, and judgment was rendered for American Sand and Gravel Company. In taking this action, the court held that mining gravel was a reasonable use of the lower land and, in part, said:

> To mine gravel, it is necessary to go down below the surface sometimes to the depth of many feet, and the inevitable result of such operations, if the land be comparatively level, is in most cases to create artificial lakes or ponds as the work progresses. *Since this result is inevitable in the nature of things, it must be deemed a reasonable result, a reasonable operation or use, else we would be driven to say that such mining operations cannot rightfully be conducted at all, without obtaining by purchase from abutting landowners the right so to do.* It would seem, therefore, on principle of necessity that, on account of such mining operations, there ought to be no cause of action for an incidental acceleration of a natural flow of waters along a natural water course, no foreign waters being added, and none being diverted or polluted, else the right of mining would no longer be a real right to a landowner, but would depend upon so many burdensome factors arising above and beyond the mine owner's land as to make the business intolerably hazardous, to the detriment of the development of the natural resources of the country. (Emphasis added.)

The Supreme Court by analogy applied the rule which had been established with respect to the rights of upper riparian owners, among other things, saying:

> The great weight of authority in this country is that an upper riparian owner, to improve and reclaim his upper lands, may straighten the water course on his said upper lands by an artificial channel, along the course of said natural water course, as a substitute therefor, and of such width and depth as to prevent overflow on said upper lands, although the result of the improvement would be to increase the volume and speed of the flow in the stream at the line of the abutting owner below. (Citing authorities.)

> Since then, as is the law according to the great weight of authority, the upper landowner may so improve and reclaim, it would follow, upon equal reason, that the owner below the complaining landowner may do the like, where there are no exceptional circumstances, may straighten the water course on the lands below the complaining landowner by an artificial channel along the course of the said natural water course of such width and depth as to prevent overflow on said lower lands, even though it increases the velocity of the flow on the upper lands. If this were not true, the practical result would be that no person other than the owner at the extreme head of the water course would have any such right of improvement and reclamation, and a vast acreage of land in this state would have to remain in a state of nature

so far as the proprietary rights of the owners therein were concerned.

 It almost goes without saying that the development of any land in this area, which is a part of the metropolitan area in and around Memphis, Tennessee, as a residential-type subdivision is a reasonable use. In fact, it is such a reasonable use as should have been anticipated by Herman F. Haisch when he acquired the property here involved.[3] Certainly, it is just as much a reasonable use as the "good husbandry" mentioned in *Board of Drainage Commissioners* and even more reasonable use than mining gravel which was dealt with in *American Sand*. Under the authority of those two cases, this court must now conclude that defendant as an upper riparian owner had the right to improve its lands by straightening and improving the water courses thereon along the courses thereof, as substitutes therefor, and of such width and depth as to properly drain said upper lands, although the result of the improvements would be to increase the volume and speed of the flow in these streams onto the land of plaintiffs. Moreover, this court must also hold, particularly under the authority of *American Sand,* that such damages, as may have been occasioned to plaintiffs' land by reason of defendant's improvement of the water course downstream from the Haisch property, are not recoverable. Any and all damages reasonably done to plaintiffs' land by reason of defendant's aforementioned undertakings, above and below plaintiffs' land on these water courses, are *damnum absque injuria.* See also Clements v. Town of Carrollton, 216 Miss. 859, 63 So.2d 398 (1953); Palmer, et ux., v. Massengill, et al, supra; Jones, et ux., v. Walker, 44 So.2d 466 (1950); Cauthen v. City of Canton, 144 Miss. 471, 110 So. 123 (1926) and Herring v. Lee County, 130 Miss. 1, 93 So. 436 (1922).

## IV.

Moreover, it should be said that even if plaintiffs' land had been damaged by defendant in an actionable way, they did not make any proof which could be considered properly to establish the measure of damages. No evidence was introduced to show any depreciation to or diminution of the rental value of the Haisch land, nor was any valid evidence offered to establish the fair market value of the Haisch property before or after the developments of defendant upon which this suit is predicated. One witness did testify that this difference would be the cost necessary to correct the drainage, but, the only evidence offered which tended to show such expense, was in fact an engineer's estimate of the cost of work which, as this court finds, would put plaintiffs' land in a better or more salable condition than it was before defendant's developments began.

 In case of damage or injury of a temporary nature to real estate, the measure of damages is the depreciation or diminution of the rental or usable value of the land for the time span of the damage. City of Oxford v. Spears, 228 Miss. 433, 87 So.2d 914 (1956); Southland Company v. Aaron, 224 Miss. 780, 80 So.2d 823 (1955). Where there is permanent damage to real estate, the proper measure of damage is "the diminution in the market value of the property by reason of that injury". Union Producing Co. v. Pittman, 245 Miss. 427, 146 So.2d 553 (1962). See also Alabama Great So. R. R. Co. v. Broach, 238 Miss. 618, 119 So.2d 923 (1960); General Geophysical Co. v. Brown, 205 Miss. 189, 38 So.2d 703 (1949); 15 Am.Jur. Damages § 109, p. 517. The cost of *restoration* of the damaged property to its former condition is admissible only as bearing upon the "before and after" market value and does not alone establish damage nor constitute the basis for a verdict. Baker v.

---

3. He had planned to develop on his land which is involved here a residential subdivision of his own. This was about four years before defendant's activities in this area began.

Miss. Highway Comm., 204 Miss. 166, 37 So.2d 169 (1948); State Highway Commission v. Corley, 186 Miss. 437, 191 So. 119 (1939).

From what has been said, it follows that plaintiffs' suit must fail, and in accordance with this opinion, an order will be entered dismissing their complaint and case.