# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00501-COA

**FRANK HEGMAN AND HEGMAN FARMS INC.**  APPELLANTS

**v.**

**CLAY ADCOCK, WILL PHILLIPS, ALFRED F.**  APPELLEES
**EATON AND ANN W. BALLARD**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/22/2022 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS-BLACKMON |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | GEORGE PHILIP SCHRADER IV |
| ATTORNEY FOR APPELLEES: | WILEY JOHNSON BARBOUR JR. |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 01/09/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Frank Hegman and Hegman Farms Inc. (collectively, Hegman), an upper riparian landowner, filed a complaint against lower riparian landowners Alfred F. Eaton and Ann Ballard, their tenant Clay Adcock, and contractor Will Phillips (collectively, Appellees). Hegman claimed that the Appellees' land-forming operations impeded the natural flow of water off of Hegman's property, and he sought injunctive relief and damages.

¶2. Adcock filed a counterclaim against Hegman alleging tortious interference with business relations. After a bifurcated hearing, the Yazoo County County Court denied Hegman's claim for injunctive relief and compensatory damages and found Hegman liable to Adcock for tortious interference with business relations. The county court awarded

Adcock compensatory and punitive damages. The county court also found Hegman in contempt of court.

¶3. Hegman appealed from county court to circuit court. After hearing oral arguments, the Yazoo County Circuit Court affirmed in part the county court's judgment, reversing only the county court's finding of contempt.

¶4. Hegman now appeals. After our review, we affirm the circuit court's judgment affirming the county court's denial of Hegman's claim for injunctive relief and compensatory damages and the county court's denial of Hegman's motion for specific findings of fact and conclusions of law pursuant to Mississippi Rule of Civil Procedure 52. However, we find that Adcock failed to prove his counterclaim of tortious interference with business relations by a preponderance of the evidence. We accordingly reverse the circuit court's judgment affirming the county court's award of compensatory and punitive damages and render judgment denying Adcock's counterclaim.

**FACTS**

¶5. Hegman Farms, Eaton and Ballard, and Frank own three separate but adjoining tracts of real property in Yazoo County, Mississippi. Eaton and Ballard's property (the Eaton-Ballard Tract) is located in the middle of the properties owned by Frank (the Hegman Tract) and Hegman Farms (the Hegman Farms Tract), with the Hegman Farms Tract located to the west of the Eaton-Ballard Tract and the Hegman Tract located to the east.

¶6. At the time of the action, Frank was a co-owner of a family business that farms both

the Hegman Tract and Hegman Farms Tract. Hegman Farms leased the Hegman Tract from Frank for the purposes of planting and harvesting annual agricultural crops. Clay Adcock began leasing the Eaton-Ballard Tract in 2014 for his farming operations.

¶7.     Hegman alleges that prior to September 17, 2015, the Hegman Tract was located at a higher elevation than the Eaton-Ballard Tract, and the Eaton-Ballard Tract was at a higher elevation than the Hegman Farms Tract. According to Hegman, the slope of these properties caused rainwater and surface water to flow in a westerly and northwesterly direction from the Hegman Tract, over the Eaton-Ballard Tract, then onto the Hegman Farms Tract, and ultimately into specifically constructed drainage pipes and ditches that allowed the water to reach a drainage ditch west of the Hegman Farms Tract.

¶8.     In 2015, Adcock hired Phillips to perform land-forming work (also referred to in the record as "dirt work") on the Eaton-Ballard Tract.[1] This work involved building up the ground elevation on the east side of the Eaton-Ballard Tract along the common boundary line with the Hegman Tract.

¶9.     In February 2016, Hegman filed a complaint against the Appellees seeking compensatory damages and injunctive relief to prevent and correct damage allegedly caused by excessive drainage on the Hegman Tract. Hegman alleged that the land-forming work performed on the Eaton-Ballard Tract substantially altered and increased the elevation of that

---

[1] The record reflects that "land-forming" is the process of using equipment to add, move, or remove dirt or soil from one place to another to alter the ground elevation and slope of a piece of property.

3

tract, which then prevented surface water from flowing off of the Hegman Tract. Hegman claimed that because the surface water was obstructed from flowing off of the Hegman Tract, the water began to pool and accumulate, which prevented Hegman from planting and harvesting the annual crops on the affected land. Hegman further asserted that the Appellees intentionally or negligently breached their duty to Hegman not to alter the elevation of the lower lands to a level that would impede the flow of surface water, and, according to Hegman, this breach of duty proximately caused Hegman to suffer damages.

¶10. In the complaint, Hegman specifically requested that the county court grant a temporary restraining order and permanent injunction requiring the Appellees to cease and desist from raising the elevation of the Eaton-Ballard Tract and disrupting the flow of surface water drainage from the Hegman Tract over and through the Eaton-Ballard Tract to the west. Hegman also requested that the court either order the Appellees to return the Eaton-Ballard Tract to its original state of elevation and grade or to otherwise "design, create, install or otherwise construct a drainage system" on the Eaton-Ballard Tract to allow surface water to drain off the Hegman Tract as it had prior to September 17, 2015. Hegman also sought compensatory damages.

¶11. Adcock filed his answer to Hegman's complaint and asserted a counterclaim against Hegman for tortious interference with business relations. Adcock alleged that before filing the lawsuit, Frank reviewed and discussed with Phillips the plan specifications for the land-forming project and dirt work on the Eaton-Ballard Tract. According to Adcock, Hegman

4

ultimately approved the work. Adcock stated that he relied on this approval in proceeding with the project. Adcock asserted that in the spring of 2016, he intended to grow crops on the Eaton/Ballard Tract and sell those products following harvest, but Hegman's lawsuit precluded him from performing this work. Adcock stated that Hegman's lawsuit also precluded him from performing additional land-forming work on the Eaton-Ballard Tract, which would have made the land more suitable for farming. Adcock maintained that he suffered damages as a result of Hegman's interference.

¶12. On November 18, 2016, the county court held a hearing on Hegman's motion for a temporary restraining order and permanent injunction. The parties submitted evidence, and the court heard testimony from Hegman, Adcock, Phillips, and Adcock's expert, Bill Sheppard, a licensed professional civil engineer whom the county court accepted as an expert on land grading, irrigation, drainage, and water management.

¶13. On December 16, 2016, the county court entered an order denying Hegman's motion for a temporary restraining order and permanent injunction with prejudice after finding that Hegman failed to prove that any negligence or intentional acts or omissions by the Appellees proximately caused Hegman to suffer damages that would entitle him to injunctive relief. The county court declined to consider Hegman's claims for monetary damages or Adcock's counterclaim at the hearing, explaining that those claims would remain pending.

¶14. The county court also directed Adcock and Phillips to finish the land-forming work, after which time the court would determine what damages, if any, were caused by the land-

5

forming work, as well any damages to which Adcock may be entitled based on his counterclaim for tortious interference with business relations.

¶15.   In April and May of 2017, Adcock filed motions for injunctive relief and for contempt against Hegman, alleging that Hegman intentionally interfered with Adcock's land-forming work on the Eaton-Ballard Tract.

¶16.   On March 1, 2, and 7, 2018, the county court held a hearing on the remaining issues. The county court heard testimony from Hegman's experts: Kimble Slaton, a licensed professional land surveyor, and Bobby Carpenter, a licensed civil engineer. The county court also heard additional testimony from Hegman, Adcock, Phillips, and Adcock's expert Bill Sheppard.

¶17.   After reviewing the testimony and evidence presented, the county court entered an order on September 30, 2019, finding that Adcock met his burden of proving by a preponderance of the evidence all the elements of his claim of tortious interference with business relations.[2]   The county court awarded Adcock $94,176.12 in compensatory damages: $58,917.36 in 2016 on soybeans, $13,073.87 in 2017 on soybeans, and $20,003.93 in 2017 on cotton, as well as $2,180.96 in reduced gin rebates caused by Adcock's reduced cotton production in 2017. The county court also found that Adcock was entitled to punitive damages based on Hegman's "willfulness, malice[,] and intent to cause damages to Adcock's

_____

[2] The briefs refer to this as the September 27, 2019 order. Although the order was signed on September 27, 2019, the county court's docket reflects that the order was entered on September 30, 2019.

lawful business" and accordingly awarded Adcock $1,000 in punitive damages. As to Adcock's motions for contempt, the county court found Hegman in contempt of court and fined him $1,000.

¶18. Hegman filed a timely motion for reconsideration, relief from judgment, a new trial, and for specific findings of fact and conclusions of law pursuant to Mississippi Rules of Civil Procedure 52, 59, and 60. Hegman also filed a supplemental motion for relief from the judgment, alleging that Sheppard's billing entries show he manipulated and altered his maps and findings based on advice from Adcock's counsel. Hegman specifically asserted that Adcock's counsel advised Sheppard to take out the verbiage on the maps referencing "adversely affected areas." Adcock responded and explained that his counsel advised Sheppard to change the wording due to concern that Hegman would attempt to portray such verbiage as an admission of fault by Adcock and Phillips. Adcock argued that Sheppard testified he labeled those areas as affected "[b]ecause [h]e couldn't tell exactly what was going on right in there," but he "knew something was happening . . . on the line." Adcock argued that Sheppard never testified that the words "affected area" were intended to denote areas of Hegman's land that were damaged or otherwise adversely impacted.

¶19. On February 29, 2020, Judge Mills Barbee recused himself from the case, and the Mississippi Supreme Court appointed Judge Barry Ford to preside over the case. On August 21, 2020, the county court entered a final judgment denying Hegman's motions and adopting the findings and rulings from the September 30, 2019 final order.

¶20. Hegman appealed to the Yazoo County Circuit Court. After reviewing the record and hearing oral arguments from counsel, the circuit court entered an order affirming the county court's rulings in part and reversing in part. The circuit court found insufficient evidence to support the finding of contempt, so the circuit court reversed and rendered the county court's finding of contempt against Hegman.

¶21. This appeal followed.

## STANDARD OF REVIEW

¶22. This appeal primarily concerns the rulings the county court made. The circuit court had the role of an intermediate appellate court in this case; as a result, we will review the county court's rulings "without any deference to the analysis of the circuit court."[3] *Robinson v. Singh*, 303 So. 3d 65, 71 (¶21) (Miss. Ct. App. 2020).

## DISCUSSION

### I.    Adcock's Counterclaim for Tortious Interference with Business Relations

¶23. Hegman argues that the county court applied an erroneous legal standard and committed manifest error by finding Hegman liable to Adcock for tortious interference with business relations. When reviewing cases like the one before us where "the county court sits as the fact-finder," we recognize that "the circuit court and this Court, as appellate courts, are bound by the judgment of the county court if supported by substantial evidence and not

---

[3] *See* Miss. Code Ann. § 11-51-79 (Rev. 2019) (requiring appeals from county court to circuit court to be "considered solely upon the record as made in the county court").

manifestly wrong." *Biloxi Dock & Ice LLC v. Back Bay Fuel & Ice LLC*, 340 So. 3d 378, 382 (¶16) (Miss. Ct. App. 2022) (internal quotation marks omitted). "[T]he judgment of a circuit or county court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree." *Id*. "Questions of law are reviewed de novo." *Id*. We further recognize that "trial judge, sitting as the trier of fact, is the sole judge of the credibility of the witness[es]." *Edwards v. State*, 355 So. 3d 784, 788 (¶18) (Miss. Ct. App. 2023).

¶24. Hegman submits that *Par Industries Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (¶10) (Miss. 1998), and *Scruggs, Millette, Bozeman & Dent P.A. v. Merkel & Cocke P.A.*, 910 So. 2d 1093, 1098 (¶23) (Miss. 2005), provide the proper elements for establishing a claim for tortious interference with business relations. In *Par Industries*, the Mississippi Supreme Court distinguished the claim of tortious interference with a contract from the claim of tortious interference with business relations. *Par Industries*, 708 So. 2d at 48 (¶10). The supreme court explained that tortious interference with a contract occurs when a person unlawfully and intentionally interferes with and causes damage to another's business, and tortious interference with business relations "occurs when a person unlawfully diverts prospective customers away from one's business." *Id*. at 48 (¶¶8-10). Hegman asserts that pursuant to this definition, the county court erred in finding him liable for tortious interference with Adcock's business relations. Hegman argues that Adcock failed to prove that Hegman intentionally, willfully, and unlawfully diverted any customers away from Adcock's business for the calculated purpose of causing damage to Adcock's business.

9

¶25. However, in *Par Industries*, the supreme court clarified that although it originally "intended there be different elements for elements for interference with business relations and interference with contract," the court later established that "the same four elements for interference with a business relationship . . . apply to the separate tort of interference with contract." *Id*. at 48 (¶10) (citing *MBF Corp. v. Century Business Commc'ns Inc*., 663 So. 2d 595, 598 (Miss. 1995)). Therefore, we find the county court correctly applied the four elements necessary to prove a claim for tortious interference with business relations as set forth in *MBF Corp.*:

> (1) The acts [of the defendant] were intentional and willful; (2) The acts were calculated to cause damage to the plaintiffs in their lawful business; (3) The acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); (4) Actual damage and loss resulted.

663 So. 2d at 598; *see also Biglane v. Under The Hill Corp*., 949 So. 2d 9, 18 (¶29) (Miss. 2007). The plaintiff must prove all four elements by a preponderance of the evidence. *MBF Corp*., 663 So. 2d at 598-99.

¶26. As to the first element of the claim, Adcock alleges that Hegman's filing of the complaint on February 5, 2016, precluded Adcock from conducting his spring 2016 business farming operations on the Eaton-Ballard Tract and from performing additional land-forming work that would make the land more suitable for farming. Hegman maintains that he did not file the complaint for the purpose of intentionally and willfully interfering with Adcock's business; rather, he filed the complaint for the sole purpose of seeking judicial relief to

10

restore adequate drainage to Hegman's property and to recover damages caused by Adcock's land-forming project. Hegman argues that Phillips's testimony at the hearing reflects that Phillips had to stop the land-forming project due to the rain and weather conditions, not because of the lawsuit.

¶27. Our review of the hearing transcript confirms that Phillips testified before the county court that he had to temporarily stop the land-forming work on the Eaton-Ballard Tract due to weather conditions. However, Phillips's testimony also reflects that he intended to resume and complete the land-forming project once the weather improved. When asked why he did not resume the work once the weather conditions improved, Phillips answered that he received a restraining order from Hegman prohibiting him from performing any more work on the project.[4] Phillips then clarified that the only reason he had not completed the land-forming work by the time of the November 18, 2016 hearing was because of Hegman's lawsuit.

¶28. Adcock also testified and confirmed that he intended to complete the land-forming work once the weather conditions improved, but he was unable to do so because of Hegman's lawsuit. Adcock admitted that he never received a court order expressly prohibiting him from completing the land-forming work, but he testified that his attorney instructed him to stop the land-forming work while the lawsuit was pending. Adcock stated

---

[4] The record does not contain any restraining order against Phillips; instead, it appears that Phillips is referring to Hegman's complaint and motion seeking a temporary restraining order.

11

that before Phillips paused the work due to the weather conditions, the land-forming work was ninety percent complete.

¶29.    After reviewing the evidence and testimony, the county court ultimately found that Hegman's actions "were intentional and willful, were calculated to cause damage to Clay Adcock's lawful farming business, and were done with the unlawful purpose of causing damage and loss, without right or justifiable cause." The county court listed instances of Hegman's conduct in support of its finding that Hegman's filing of the lawsuit was malicious, including Hegman's trespassing and interfering with the work being done on the Eaton-Ballard Tract, as well as Hegman's performing work on his land years prior to the commencement of the land-forming work to address problems and drainage issues that Hegman later blamed on the land-forming work.

¶30.    The county court further explained that it based its opinion and findings on the evidence presented and "upon witness credibility and the plausibility of the many differing of bits of testimony of the witnesses." The testimony shows that prior to filing the complaint, Hegman and Phillips had a conversation regarding the land-forming project on the Eaton-Ballard Tract. Phillips testified that he and Hegman ran into each other at a gas station approximately a month before Hegman filed his complaint. According to Phillips, Hegman asked about the work Phillips was performing on the Eaton-Ballard Tract, and Phillips informed Hegman about the land-forming work. Phillips explained to Hegman that the project would also benefit Hegman's land. Phillips testified that Hegman acknowledged his

12

approval of the work, and Hegman told Phillips that all he wanted was for someone to tell him what was going on. At the hearing, Hegman acknowledged that he ran into Phillips at a gas station, but he disputed Phillips's recollection of their conversation, as well as the time frame for when it occurred. Hegman also testified when he filed his complaint in February 2016, he believed that Adcock and Phillips had completed the land-forming project.

¶31. The county court ultimately found that Phillips was more credible than Hegman, noting that "Phillips had no motivation to misrepresent the occurrence and substance" of the disputed discussion with Hegman about the land-forming work because "[Phillips] had not asserted any claims against Hegman based upon said discussion." However, the county court determined that "[t]he opposite is true with regard to Hegman, as said purported discussion is a basis for the counterclaim filed against him by Clay Adcock." The county court also found that Hegman's testimony that he thought the land-forming project was complete at the time he filed his complaint was not credible. The county court explained that Hegman's complaint showed that he expressly requested that the county court order Adcock "to immediately cease and desist" from engaging in any further land-forming activities on the Eaton-Ballard Tract, which made it "clear that Hegman knew the subject land-forming work was not complete when he filed suit." The county court judge concluded, based on Hegman's contradictory statements, that Hegman's testimony regarding his knowledge about the status of the land-forming project "was untruthful."

¶32. Upon review, we find that the record does not support the county court's finding that

13

Hegman's act of filing the lawsuit was "intentional and willful, . . . [was] calculated to cause damage to [Clay Adcock's lawful farming business], and . . . [was] done with the unlawful purpose of causing damage and loss, without right or justifiable cause." *MBF Corp.*, 663 So. 2d at 598. As stated, the third element necessary to prove a claim of tortious interference with business relations is that "[t]he acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)." *Id.* Adcock, as the counterclaimant, was required to prove all four elements by a preponderance of the evidence. *Id*.

¶33. Instead, our review of the record shows that Hegman provided sufficient evidence showing that he had a justifiable right to file his lawsuit and that his filing of the lawsuit was not malicious or even frivolous. At the hearing, Hegman produced two qualified experts—Slaton and Carpenter—who testified and provided evidence in support of Hegman's claim that the land-forming work affected the flow of surface water off of the Hegman Tract and caused damage to Hegman's land. Slaton testified that he personally observed standing water on the Hegman Tract, and he also identified areas on the aerial photo mosaic maps admitted into evidence that depicted standing water on the Hegman Tract near the common boundary line with the Eaton-Ballard Tract. Carpenter testified that he also observed flooded field conditions on the west side of the Hegman Tract. After reviewing maps and photographs and performing his own inspection of the properties, Carpenter testified regarding his conclusion that the land-forming project on the Eaton-Ballard Tract

14

obstructed and prevented adequate surface water drainage from the west side of the Hegman Tract. Although the county court found Adcock's expert witness more credible than Hegman's experts, the record reflects no objection to Slaton or Carpenter's qualifications or to the county court's acceptance of them as experts in their respective fields of expertise. The record further shows that although Hegman's lawsuit was ultimately unsuccessful, the county court denied Adcock's motion for a directed verdict at the close of Hegman's case-in-chief after finding that Hegman had provided sufficient evidence in support of his case to continue with the hearing.

¶34. Both parties also agree that upon Hegman's filing of the lawsuit, the county court never entered any order commanding Adcock and Phillips to cease the land-forming operations or preventing them from completing the project. The record contains no action by Adcock seeking a ruling on Hegman's request for a temporary restraining order or injunction prior to the November 2016 hearing, which was held over nine months after Hegman filed the lawsuit. Adcock also failed to cite any cases in support of his argument that the filing of a lawsuit constitutes an act sufficient to satisfy the third element of tortious interference with business relations.

¶35. After our review, we find that Hegman possessed a justifiable, factual basis for filing his lawsuit. Although Hegman's lawsuit was ultimately unsuccessful, the record reflects that it was not frivolous or malicious. The supreme court has held that "[t]he general rule in this state is that there is no tortious interference when one has a justifiable interest and reason for

15

acting." *Hopewell Enters. Inc. v. Trustmark Nat. Bank*, 680 So. 2d 812, 819 (Miss. 1996); *see also Progressive Casualty Insurance v. All Care Inc*., 914 So. 2d 214, 219 (¶7) (Miss. Ct. App. 2005) ("[T]ortious interference requires intermeddling without sufficient reason." (internal quotation mark omitted)). Because Hegman possessed a justifiable basis and right to file his lawsuit, we find no substantial evidence supports the county court's ruling that Adcock proved the third element required for tortious interference with business relations by a preponderance of the evidence.[5] We therefore reverse the circuit court's judgment affirming the county court's judgment finding Hegman liable to Adcock for tortious interference with business relations and awarding compensatory and punitive damages. We render judgment denying the counterclaim.

## II.    Hegman's Claim for Injunctive Relief and Damages

¶36.    Hegman also argues that the county court erred in denying his claim for damages and injunctive relief.[6] Hegman claims that the overwhelming weight of the evidence at trial established that the Appellees' land-forming project on the Eaton-Ballard Tract adversely and unlawfully affected the drainage of the Hegman Tract. Hegman asserts that the county court

---

[5] Because a claimant must prove all four elements in order to prevail upon a claim of tortious interference with business relations, we decline to address Hegman's argument regarding the fourth and remaining element—damages. *See Progressive Cas. Ins.*, 914 So. 2d at 221 (¶13).

[6] At oral argument, Hegman's counsel appeared to waive this issue. However, because Hegman's claim for injunctive relief and damages was ruled on in the judgment before us on appeal, and because Hegman fully briefed this issue, we will proceed to address it.

16

should have required the Appellees to construct a ditch on the east side of the Eaton-Ballard Tract's boundary line to allow surface water to drain off the Hegman Tract and into the existing drainage ditch running along the north end of the Eaton-Ballard Tract or, in the alternative, pay for the costs of digging a ditch on the west side of the Hegman Tract's boundary line.

¶37. Hegman further argues that the county court should have awarded him damages for two rental values of the affected area, as well as all costs and legal expenses, including attorney's fees and fees for expert witnesses necessary to substantiate his claim.

¶38. "In determining whether a verdict is against the overwhelming weight of the evidence, we must accept as true the evidence presented as supportive of the verdict." *Erves v. Hosemann*, 335 So. 3d 603, 612 (¶18) (Miss. Ct. App. 2022). "We will disturb a verdict only when convinced that the lower court has abused its discretion or if the final result will result in an unconscionable injustice." *Id*. "[O]nce a verdict has been returned in a civil case, 'we are not at liberty to direct that a judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical [finder of fact] could have' made the same finding." *Id*. (quoting *Starcher v. Byrne*, 687 So. 2d 737, 739 (Miss. 1997)).

¶39. Hegman's complaint alleged that the Appellees' land-forming work on the Eaton-Ballard Tract obstructed the natural drainage of surface water from the Hegman Tract and caused damage to the land and farming operations. We recognize that "[i]n diverting waters

17

from his lands, any landowner must use reasonable care to prevent unnecessary injury to adjoining landowners." *Hall v. Wood*, 443 So. 2d 834, 839 (Miss. 1983) (citing *Holman v. Richardson*, 115 Miss. 169, 179, 76 So. 136, 137 (1917)). The supreme court has held that "[i]f a lower riparian landowner obstructs the flow of a stream or water course, thereby causing his upper riparian neighbor's lands to flood, the latter may secure judicial relief." *Ga. Pac. Corp. v. Armstrong*, 451 So. 2d 201, 205 (Miss. 1984). "In such cases, the burden is upon the plaintiff to show that the acts of the lower riparian landowner were a substantial contributing cause of the damages he suffered." *Id*. "Redress may take the form of an award of damages, temporary or permanent, or both, and an injunction, mandatory or prohibitory, or both, as may be appropriate." *Id*. The trial court "may provide for such other redress as may be equitable and proper under the facts and circumstances of the particular case." *Id*.

¶40. The main issues before the county court were which direction the surface water on the Hegman Tract naturally drained off of the property, and whether the land-forming work on the Eaton/Ballard Tract affected or impaired the drainage. At the hearing, Hegman asserted that the water always drained to the west (toward the Eaton-Ballard Tract) and that the land-forming work blocked the flow of the water. However, the Appellees asserted that the surface water drained off of the Hegman Tract to the east (away from the Eaton/Ballard Tract). At the hearing, the parties presented expert witnesses in support of their respective positions regarding surface water drainage.

¶41. The county court heard from Hegman's expert witnesses: Kimble Slaton, an expert

18

in the field of topographical surveying, and Bobby Carpenter, an expert in the field of civil engineering. Slaton testified that in January 2018, he used a drone to perform an aerial survey of the area at issue for the purposes of "stitching together" the photographs to extract features and topographic information. Slaton used the aerial survey to prepare a map for an engineer to use to conduct a watershed study, which studies the flow of water across a piece of property and the impact that it may have on other properties. Slaton testified that he also prepared a map of the areas at issue based on historical data he obtained from the Mississippi Automated Resource Information System, which is a graphic information system compilation. Slaton explained that he was also able to find data taken by LiDAR, an aerial survey performed by lasers mounted on an airplane, to create a map showing the features of the areas at issue in 2009. Slaton testified that the map from 2018 shows changes in elevation on the Eaton-Ballard Tract that did not exist in 2009.

¶42. During cross-examination, Slaton admitted that he did not perform any on-the-ground surveys or take photographs from ground level to determine elevation levels on the properties. Slaton admitted that elevation levels measured from the ground are more reliable than elevation levels taken from the air. Slaton also admitted that if a discrepancy existed between elevation levels taken from an aerial survey and an on-the-ground survey, he would defer to the ground-level survey because they are more reliable. Slaton further stated that standing water could affect the accuracy of aerial elevation levels.

¶43. Carpenter testified that Hegman asked him to conduct a watershed study on the

19

properties at issue. Carpenter explained that this entailed using available information, such as historical maps of the property and site visits, including data created by Slaton, to create a topographical map showing ground contours and the flow of water drainage. In February 2018, Carpenter prepared a report of his findings, and the report was admitted into evidence. Based on his findings, Carpenter opined that the higher elevation of the Eaton-Ballard Tract blocked water from draining off of the Hegman Tract. Carpenter determined that prior to the land-forming work on the Eaton-Ballard Tract, the surface water flowed west off of the Hegman Tract, across the Eaton-Ballard Tract, and continued flowing west until it eventually entered a drainage ditch on the Hegman Farms Tract. Carpenter testified that the higher elevation on the Eaton-Ballard Tract caused by the land-forming work prevented the surface water from flowing west, and as a result, the surface water began "ponding" on the Hegman Tract.

¶44. Carpenter testified that Hegman also expressed concern about access to and future maintenance of a drainage ditch across the Eaton-Ballard Tract, and as a result of Hegman's concerns, Carpenter recommended the installation of a ditch along the eastern property line of the Eaton-Ballard Tract, with the ditch running south to north. Carpenter also recommended that a larger drainage pipe be installed in a ditch running under Adcock's field road to allow adequate flow through the existing ditch that runs along the north end of the Hegman Tract. During cross-examination, Carpenter admitted that his recommendations addressed potential future concerns about issues that had not yet occurred and may never

20

occur.

¶45.    The county court also heard testimony from Adcock's expert witness, Bill Sheppard, who was accepted as an engineering expert on matters related to land grading, irrigation, drainage, and water management. Sheppard testified that he had reviewed Adcock and Phillips's land-forming plans, and he opined that when the project was complete, neither the Hegman Tract nor the Hegman Farms Tract would be injured by the blockage and pooling of water. Sheppard also opined that the land-forming work, once completed, would benefit Hegman's property and improve surface water drainage.

¶46.    Sheppard testified that as part of his work on this case, he prepared maps compiled from LiDAR data that showed the historic drainage patterns of the Hegman Tract. Sheppard explained that these maps, which were admitted into evidence, indicated that historically, some portion of the Eaton-Ballard Tract has drained to the east onto the Hegman Tract, and some portion of the Eaton-Ballard Tract has also drained to the west onto the Hegman Farms Tract.

¶47.    Sheppard also testified that he performed a site visit to the Eaton-Ballard Tract in February 2018 and took on-the-ground measurements of the tract using his survey-grade GPS system. Sheppard explained that he also took on-the-ground measurements to verify his LiDAR data. Sheppard testified that data from a survey performed on the ground is "absolutely" more reliable than LiDAR data. Sheppard explained that his initial survey was based off LiDAR data, but he testified that after performing an on-the-ground survey of the

21

areas at issue, he discovered details that were not provided in the LiDAR data and that caused him to change his opinions regarding drainage patterns on the Eaton-Ballard Tract; namely, that the western half of the Hegman Tract has historically drained and continues to drain to the east, away from the Eaton-Ballard Tract.[7]

¶48. After hearing testimony from the expert witnesses and reviewing the evidence presented, the county court found that the experts presented conflicting opinions as to the direction surface water naturally drained off of the Hegman Tract and whether the land-forming work affected the surface water drainage from the Hegman Tract. The county court ultimately determined that Sheppard's opinions regarding the historic and current drainage patterns of the tracts at issue were more reliable, explaining that Sheppard based his opinion "upon on ground survey data[,] which even [Hegman's] expert Kimble Slaton admits is the most reliable data available." The county court further found that Hegman "offered no credible proof indicating that said data is flawed in any way." In reviewing the record, we

---

[7] As stated above, after the county court entered its judgment, Hegman filed a supplemental motion for relief from the judgment pursuant to Mississippi Rule of Civil Procedure 60(b), alleging that Sheppard's billing entries show that he manipulated and altered his maps and findings to remove the verbiage "adversely affected areas." At the hearing on Hegman's motion, Adcock's counsel explained that he advised Sheppard to change the wording due to concern that Hegman would attempt to portray such verbiage as an admission of fault by Adcock and Phillips. Adcock's counsel also argued that Hegman never claimed that Sheppard changed the substance of his maps; rather, Hegman only argued that Sheppard removed the word "adversely." The county court found no merit to Hegman's claim and denied relief. On appeal, Hegman does not advance an argument regarding the county court's denial of his Rule 60(b) motion; accordingly, we will not discuss the merits of that particular issue. *See Jackson v. State*, 962 So. 2d 649, 678 (¶105) (Miss. Ct. App. 2007).

"recognize[] that the trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses." *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (¶14) (Miss. 2003).

¶49. Regarding the alleged drainage issues on the Hegman Tract, Hegman testified at trial that in 2010 he installed culvert #4 to help with drainage issues. Hegman testified that he performed regular maintenance on culvert #4 to unclog any blockages and to keep the water flowing. Testimony reflects that during the litigation, Adcock hired Tim Pepper to perform an inspection on culvert #4 and assess any drainage issues. Hegman testified that he was aware that Adcock requested the inspection and that the inspection was performed on August 25, 2017. Hegman denied performing any work on culvert #4 in preparation for the inspection.

¶50. However, Adcock submitted photographs and videos into evidence depicting the condition of the properties at issue between June 21, 2016, and February 28, 2018. The photos and videos showed the western half of the Hegman Tract experienced severe and repeated drainage problems caused by standing water originating at the location of culvert #4. Despite Hegman's testimony that he regularly maintained and unclogged culvert #4, these photographs and videos show that culvert #4 was continuously obstructed from approximately January 30, 2017, through August 17, 2017. Adcock testified regarding two photographs of culvert #4: one taken on August 17, 2017, and one taken on August 24, 2017, one day before Pepper inspected the culvert. Adcock observed that in the picture from

August 17, the opening of the culvert was covered, and in the picture from August 24, the culvert had been cleaned out. The county court found that videos and photographs admitted into evidence "wholly undermine" Hegman's testimony that he regularly checks for any maintenance issues on the Hegman Tract and that he immediately resolves any issues that he observes, particularly any issues with culvert #4. Additionally, Sheppard testified that when he performed his site visit, he observed a "really deep" and "good" ditch on the Hegman Tract that had filled with silt and had not been cleaned out. Sheppard opined that lack of maintenance of this ditch would be a "major cause" of the water pooling on the Hegman Tract.

¶51. As stated, Hegman had the burden of showing that the Appellees' acts "were a substantial contributing cause of the damages he suffered." *Ga. Pac. Corp.*, 451 So. 2d at 205. After reviewing the testimony and evidence, the county court ultimately found that Hegman failed to prove that any negligence or intentional acts or omissions by the Appellees proximately caused Hegman to suffer damages that would entitle him to injunctive relief or damages. After reviewing the evidence as a whole and in the light most favorable to the verdict, we cannot say that the verdict is against the overwhelming weight of the evidence or that no reasonable, hypothetical finder of fact could have made the same finding. *Erves*, 335 So. 3d at 612 (¶18).

### III. Specific Findings of Fact and Conclusions of Law

¶52. Hegman next claims that the county court erred in failing to make specific findings

24

of facts and conclusions of law as requested in his amended motion for reconsideration, relief from judgment, a new trial, and for specific findings of fact and conclusions of law.

¶53. Mississippi Rule of Civil Procedure 52(a) provides:

> In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly.

Additionally, Mississippi Rule of Civil Procedure 52(b) provides:

> Upon motion of a party filed not later than ten days after entry of judgment or entry of findings and conclusions, or upon its own initiative during the same period, the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may accompany a motion for a new trial pursuant to Rule 59. When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised regardless of whether the party raising the question has made in court an objection to such findings or has filed a motion to amend them or a motion for judgment or a motion for a new trial.

¶54. We recognize that "Rule 52(a) addresses the lower court's duty to make specific findings of fact[,] . . . [and] Rule 52(b) provides the procedure that a party or the court, upon its own motion, must follow to amend a judgment or make additional findings." *Anderson v. Anderson*, 8 So. 3d 264, 268 (¶13) (Miss. Ct. App. 2009). The Advisory Committee Notes to Rule 52 provide that the "principal purpose" of Rule 52(a) "is to provide the appellate court with a record regarding what the trial court did—the facts it found and the law it applied, in part so that the appellate court can refrain from deciding issues of fact and issues that were not decided by the trial court." M.R.C.P. 52 advisory committee notes.

¶55. In his motion, Hegman requested that the county court provide specific findings of

fact and conclusions of law as to the following issues:

> a. Whether the completed land[-]forming activities on the Eaton-Ballard tract actually prevented rainwater and other run-off from draining off the Hegman tract[;] b. The nature and date of each and every specific intentional, willful and/or unlawful act Hegman committed that unlawfully diverted prospective customers away from Adcock's business; c. The nature and date of each and every specific intentional, willful and/or unlawful act Hegman committed that caused actual damage to Adcock's business; d. The nature and date of each and every specific intentional, willful and/or unlawful act Hegman committed that unlawfully prevented Adcock from completing the land[-]forming project on the Eaton-Ballard Tract; e. How each specific intentional, willful and/or unlawful act prevented Adcock from completing the land[-]forming project on the Eaton-Ballard tract; f. The specific facts on which the Court relied for measuring Adcock's damages using estimated crop yield loss rather than depreciation of rental value of lands idled due to Hegman's intentional, willful and/or unlawful acts; g. The specific legal authority on which the Court relied for measuring Adcock's damages using estimated crop yield loss rather than depreciation of rental value of lands idled due to Hegman's intentional, willful and/or unlawful acts.

¶56. Our review of the county court's September 30, 2019 judgment reflects that it contains substantial findings of fact and conclusions of law and clearly sets forth the county court's explanations for its rulings on Hegman's claims and Adcock's counterclaim. We accordingly find that the county court's judgment "clearly convey[s] the basis of his decision and [is] sufficient for this Court to review that decision." *Stowe v. Edwards*, 331 So. 3d 24, 32 (¶31) (Miss. Ct. App. 2021). Additionally, Rule 52(b) states that a request for a trial court to "amend its findings or make additional findings" is discretionary. M.R.C.P. 52(b). We therefore find no abuse of discretion by the county court in denying Hegman's request to make additional findings. *See Roley v. Roley*, 329 So. 3d 473, 499-500 (¶¶77-78) (Miss. Ct. App. 2021).

26

### IV. In-Person Site Inspection by the County Court

¶57. Finally, Hegman argues that the county court abused its discretion by refusing to make an in-person, on-site inspection of the lands involved in this action. Hegman asserts that during the litigation, he requested that the county court make an in-person, on-site inspection of the property, and the county court refused. Hegman submits that if the county court judge had personally inspected the property at issue, he would have observed that the land-forming work on the Eaton-Ballard Tract does in fact prevent water from draining off of the Hegman Tract and that Hegman was justified in filing the complaint.

¶58. In his appellate brief, Hegman fails to cite any legal authority in support of his assertion. "Our caselaw clearly provides that the failure to cite supporting legal authority precludes consideration of an issue on appeal." *Hardin v. Hardin*, 335 So. 3d 1088, 1094 (¶21) (Miss. Ct. App. 2022); *see also* M.R.A.P. 28(a)(7). Accordingly, Hegman has waived consideration of this issue on appeal.

### CONCLUSION

¶59. After our review, we affirm the circuit court's judgment affirming the county court's denial of Hegman's claim for injunctive relief and damages, as well as the county court's denial of Hegman's Rule 52 motion. However, we reverse the circuit court's judgment affirming the county court's judgment finding Hegman liable to Adcock for tortious interference with business relations and render judgment denying Adcock's counterclaim. Because we reverse the judgment for tortious interference with business relations, we also

27

reverse the award of $94,176.12 in compensatory damages and $1,000 in punitive damages.

¶60.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.  WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**